# EXHIBIT B

# LOAN AGREEMENT

Dated as of October 21, 2016

Between

## KORNBLUTH TEXAS, LLC,
as Borrower

and

## RIALTO MORTGAGE FINANCE, LLC,
as Lender

# TABLE OF CONTENTS

**Page**

I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ......................................... 2
    Section 1.1    Definitions.......................................................................... 2
    Section 1.2    Principles of Construction................................................. 24

II.    GENERAL TERMS........................................................................... 24
    Section 2.1    Loan ................................................................................... 25
    Section 2.2    Interest; Payments; Late Payment Charge ......................... 25
    Section 2.3    Prepayments...................................................................... 26
    Section 2.4    Making of Payments ........................................................ 27
    Section 2.5    Defeasance ....................................................................... 27
    Section 2.6    Release on Payment in Full............................................... 30

III.    REPRESENTATIONS AND WARRANTIES.................................... 30
    Section 3.1    Borrower Representations.................................................. 30
    Section 3.2    Survival of Representations .............................................. 36

IV.    BORROWER COVENANTS............................................................ 36
    Section 4.1    Covenants.......................................................................... 36

V.    INSURANCE; CASUALTY; CONDEMNATION ............................ 49
    Section 5.1    Insurance........................................................................... 49
    Section 5.2    Casualty............................................................................ 53
    Section 5.3    Condemnation ................................................................... 53
    Section 5.4    Restoration ........................................................................ 54

VI.    CASH MANAGEMENT AND RESERVE FUNDS ......................... 57
    Section 6.1    Cash Management.............................................................. 57
    Section 6.2    Required Repair Funds ...................................................... 62
    Section 6.3    Tax and Insurance Escrow Fund........................................ 63
    Section 6.4    Insurance Funds ................................................................ 63
    Section 6.5    Capital Expenditure Funds................................................ 64
    Section 6.6    Intentionally Omitted ....................................................... 65
    Section 6.7    Intentionally Omitted ....................................................... 65
    Section 6.8    Intentionally Omitted ....................................................... 65
    Section 6.9    Excess Cash Flow Funds ................................................... 65

## TABLE OF CONTENTS
(continued)

Page

|  | Section 6.10 | Intentionally Omitted | 65 |
|---|---|---|---|
|  | Section 6.11 | PIP Reserve Funds | 65 |
|  | Section 6.12 | Reserve Funds, Generally | 66 |
| VII. | DEFAULTS | | 67 |
|  | Section 7.1 | Event of Default | 67 |
|  | Section 7.2 | Remedies | 68 |
|  | Section 7.3 | Remedies Cumulative; Waivers | 69 |
| VIII. | SPECIAL PROVISIONS | | 69 |
|  | Section 8.1 | Sale of Mortgage and Securitization | 69 |
|  | Section 8.2 | Securitization Indemnification | 70 |
|  | Section 8.3 | Servicer | 71 |
|  | Section 8.4 | Mezzanine Loan; Components | 71 |
|  | Section 8.5 | Single Purpose Entity | 72 |
|  | Section 8.6 | Exculpation | 72 |
| IX. | MISCELLANEOUS | | 75 |
|  | Section 9.1 | Survival | 76 |
|  | Section 9.2 | Lender's Discretion | 76 |
|  | Section 9.3 | Governing Law | 76 |
|  | Section 9.4 | Modification, Waiver in Writing | 76 |
|  | Section 9.5 | Delay Not a Waiver | 77 |
|  | Section 9.6 | Notices | 77 |
|  | Section 9.7 | Trial by Jury | 78 |
|  | Section 9.8 | Headings | 78 |
|  | Section 9.9 | Severability | 78 |
|  | Section 9.10 | Preferences | 78 |
|  | Section 9.11 | Waiver of Notice | 79 |
|  | Section 9.12 | Remedies of Borrower | 79 |
|  | Section 9.13 | Expenses; Indemnity | 79 |
|  | Section 9.14 | Schedules and Exhibits Incorporated | 81 |
|  | Section 9.15 | Offsets, Counterclaims and Defenses | 81 |

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| Section 9.16 | No Joint Venture or Partnership; No Third Party Beneficiaries | 81 |
| Section 9.17 | Publicity | 82 |
| Section 9.18 | Waiver of Marshalling of Assets | 82 |
| Section 9.19 | Waiver of Counterclaim | 82 |
| Section 9.20 | Conflict; Construction of Documents; Reliance | 82 |
| Section 9.21 | Brokers and Financial Advisors | 82 |
| Section 9.22 | Joint and Several Liability | 83 |
| Section 9.23 | Limitation on Liability | 83 |
| Section 9.24 | Prior Agreements | 83 |

# SCHEDULES

SCHEDULE I          Single Purpose Entity
SCHEDULE II         Organizational Chart
SCHEDULE III        Rent Roll
SCHEDULE IV         Required Repairs – Deadlines for Completion
SCHEDULE V          Intentionally Omitted
SCHEDULE VI         Credit Card Companies

## EXHIBITS

EXHIBIT A           Form of Tenant Instruction Notice
EXHIBIT B           Form of Credit Card Instruction Notice

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of October 21, 2016 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this **"Agreement"**), between **RIALTO MORTGAGE FINANCE, LLC,** a Delaware limited liability company, having an address at 600 Madison Avenue, 12th Floor, New York, New York 10022 (**"Lender"**) and **KORNBLUTH TEXAS, LLC,** a Texas limited liability company, having an address at 302 W. Bay Area Boulevard, Webster, Texas 77598 ("**Borrower**").

WITNESSETH:

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.     DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1     Definitions.

1.1.1     Certain Defined Terms.  For all purposes of this Agreement, the following terms shall have the meanings ascribed to them below:

"**Alteration Threshold**" shall mean an amount equal to the greater of (i) one percent (1%) of the original Loan amount and (ii) $200,000.

"**Applicable Interest Rate**" shall mean 5.00% per annum.

"**Franchisor**" shall mean Holiday Hospitality Franchising, LLC, a Delaware limited liability company, or, if the context requires, any replacement franchisor approved by Lender in accordance with the terms of this Agreement.

"**Free Window Date**" shall mean the Payment Date that occurs three (3) months prior to the Stated Maturity Date.

"**Guarantor**" shall mean individually and collectively, William Kornbluth and Cheryl Tyler, and any other Person guaranteeing any payment or performance obligation of Borrower.

"**Initial Capital Expenditure Deposit**" shall mean an amount equal to $0.00.

"**Initial Insurance Deposit**" shall mean an amount equal to $18,729.77.

"**Initial PIP Deposit**" shall mean an amount equal to $279,500.00.

"**Initial Tax Deposit**" shall mean an amount equal to $166,512.54.

"**Key Principal**" shall mean Guarantor.

"**Loan**" shall mean the loan in the original principal amount of **EIGHT MILLION THREE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($8,350,000.00)** made by Lender to Borrower pursuant to this Agreement.

"**Manager**" shall mean an entity selected as manager of the Property in accordance with the terms of this Agreement or other Loan Documents or, if the context requires, a Qualified Manager that manages the Property in accordance with the terms and provisions of this Agreement and the other Loan Documents pursuant to a Replacement Management Agreement.

"**Monthly Capital Expenditure Deposit**" shall mean an amount equal to the greater of (a) an amount equal to one-twelfth (1/12) of four percent (4.0%) of Gross Income from Operations during the calendar year immediately preceding the calendar year in which such Payment Date occurs and (b) the aggregate amount, if any, required to be reserved under the Management Agreement and the Franchise Agreement.

"**Monthly Debt Service Payment Amount**" shall mean a constant monthly payment amount of $44,824.61.

"**PACE Loan**" shall mean any Property-Assessed Clean Energy loan or any similar financing.

"**Permitted Defeasance Date**" shall mean the date that is two (2) years from the "startup day" within the meaning of Section 860G(a)(9) of the Code of the REMIC Trust established in connection with the last Securitization involving any portion of the Loan.

"**Permitted Release Date**" shall mean the date that is the earlier of (a) three (3) years from the Closing Date or (b) Permitted Defeasance Date.

"**Required Repair Deposit**" shall mean an amount equal to $0.00.

"**Reserve Funds**" shall mean, collectively, the Required Repair Funds, the Tax Funds, the Insurance Funds, the Capital Expenditure Funds, the Rollover Funds, the PIP Reserve Funds, the Excess Cash Flow Funds and any other escrow or reserve fund established by the Loan Documents.

"**Restoration Threshold**" shall mean an amount equal to one percent (1%) of the Outstanding Principal Balance.

"**Stated Maturity Date**" shall mean November 6, 2026.

1.1.2   _Other Defined Terms._  For all purposes of this Agreement, except as otherwise expressly provided:

"**Account Liabilities**" shall have the meaning set forth in Section 6.1.4.

"**Accrual Period**" shall mean, with respect to any Payment Date, the period commencing on the eleventh (11th) day of the preceding month and ending on the tenth (10th) day of the calendar month in which such Payment Date occurs, provided that if the Closing Date is any date other than the eleventh (11th) day of a month, the first Accrual Period shall (i) consist of only the date hereof, if the date hereof is the tenth (10th) day of a month, or (ii) commence on the date hereof and shall end on the immediately following tenth (10th) day of a calendar month.

"**Affiliate**"  shall mean, as to any Person, any other Person that (i) directly or indirectly, owns ten percent (10%) or more of legal, beneficial or economic interests in such Person, (ii) is in control of, is controlled by or is under common ownership or control with such Person, (iii) is a director or officer of such Person or of an Affiliate of such Person and/or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

"**Affiliated Manager**" shall mean any property manager which is an Affiliate of Borrower or any Guarantor.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Approved Annual Budget**" shall have the meaning set forth in the Cash Management Agreement.

"**Approved Capital Expenditures**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Approved Leasing Expenses**" shall have the meaning set forth in Section 6.6.1 hereof.

"**Assignment of Leases**" shall mean, that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean any Assignment of Management Agreement and Subordination of Management Fees required pursuant to this Agreement and entered into among Lender, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Available Funds**" shall have the meaning set forth in Section 6.1.3.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Action**" shall mean, with respect to any Person, (i) such Person filing a voluntary petition under the Bankruptcy Law; (ii) the filing of an involuntary petition against such Person under the Bankruptcy Law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (iii) such Person filing an answer

consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Law; (iv) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; or (v) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Code**" shall mean Title 11 U.S.C. § 101 et seq., and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"**Bankruptcy Law**" shall mean the Bankruptcy Code, any other federal, state or foreign bankruptcy or insolvency law and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Broker**" shall have the meaning set forth in Section 9.21 hereof.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"**Capital Expenditure Account**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Capital Expenditure Funds**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP and the Uniform System of Accounts (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Cash Management Account**" shall have the meaning set forth in Section 6.1.3 hereof.

"**Cash Management Activation Notice**" shall mean a written notice from Lender or Servicer to Clearing Account Bank stating that a Cash Management Trigger Event has occurred and instructing Clearing Account Bank to transfer all available funds in the Clearing Account to the Cash Management Account in accordance with the Clearing Account Agreement.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, between Lender, Borrower and Cash Management Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Management Bank**" shall mean Wells Fargo Bank, National Association or any other federal or state chartered depository institution or trust company acting in its fiduciary capacity and subject to supervision or examination by federal and State authority selected by Lender.

"**Cash Management De-Activation Notice**" shall mean a written notice from Lender or Servicer to Clearing Account Bank stating that a Cash Management Trigger Event no longer exists and instructing Clearing Account Bank to transfer all available funds in the Clearing Account to an account designated by Borrower in accordance with the Clearing Account Agreement.

"**Cash Management DSCR Trigger Event**" shall mean that, as of any date on which Lender determines the Debt Service Coverage Ratio, the Debt Service Coverage Ratio based on the trailing twelve (12) month period immediately preceding the date of such determination is less than 1.25 to 1.00.

"**Cash Management Trigger Event**" shall mean the occurrence of:

    (i)    an Event of Default;

    (ii)    without waiving any Event of Default or the assessment of late charges arising therefrom, Borrower's second failure in any consecutive twelve (12) month period to pay a Monthly Debt Service Payment Amount on a Payment Date;

    (iii)    any Bankruptcy Action of Borrower;

    (iv)    any Bankruptcy Action of Guarantor;

    (v)    any Bankruptcy Action of Manager;

    (vi)    a Cash Management DSCR Trigger Event; or

    (vii)    the occurrence of a Franchise Trigger Event.

"**Cash Management Trigger Event Cure**" shall mean:

    (i)    if the Cash Management Trigger Event is caused solely by the occurrence of clause (i) in the definition of "Cash Management Trigger Event," a cure of the Event of Default which is accepted or waived in writing by Lender which gave rise to such Cash Management Trigger Event; provided that Lender shall not have exercised any of its rights under the Security Instrument to accelerate the Loan, move to appoint a receiver or commence a foreclosure action;

    (ii)    if the Cash Management Trigger Event is caused solely by the occurrence of clause (ii) in the definition of "Cash Management Trigger Event," the timely payment of Monthly Debt Service Payment Amounts on twelve (12) consecutive Payment Dates;

    (iii)    if the Cash Management Trigger Event is caused solely by the occurrence of clause (iii) in the definition of "Cash Management Trigger Event," if such Cash Management Trigger Event is as a result of the filing of an

involuntary petition against Borrower with respect to which neither Borrower, Guarantor nor any Affiliate of Borrower or Guarantor solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed within thirty (30) days of such filing; *provided* that (A) in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially increase Borrower's monetary obligations, and (B) Borrower is not in breach of the provisions set forth in Sections 4.1.12 or 8.5 of this Agreement;

(iv)    if the Cash Management Trigger Event is caused solely by the occurrence of clause (iv) in the definition of "Cash Management Trigger Event," if such Cash Management Trigger Event is as a result of the filing of an involuntary petition against Guarantor with respect to which neither Guarantor nor any Affiliate of Guarantor solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed within thirty (30) days of such filing; *provided* that, in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially and adversely affect Guarantor's ability to perform its obligations under the Loan Documents to which it is a party;

(v)    if the Cash Management Trigger Event is caused solely by the occurrence of clause (v) in the definition of "Cash Management Trigger Event," (A) if Borrower replaces Manager with a new Manager acceptable to Lender in accordance with the Assignment of Management Agreement, or (B) if such Cash Management Trigger Event is as a result of the filing of an involuntary petition against Manager with respect to which neither Manager nor any Affiliate of Manager solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed within one hundred twenty (120) days of such filing; provided that, in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially and adversely affect Manager's ability to perform its obligations under the Management Agreement;

(vi)    if the Cash Management Trigger Event is caused solely by the occurrence of clause (vi) in the definition of "Cash Management Trigger Event," once the Debt Service Coverage Ratio based upon the trailing twelve (12) month period immediately preceding the date of such determination is greater than 1.30 to 1.00 for two (2) consecutive quarters; and

(vii)    if the Cash Management Trigger Event is caused solely by the occurrence of clause (viii) in the definition of "Cash Management Trigger Event," a new Franchise Agreement acceptable to Lender (or extension of the existing Franchise Agreement acceptable to Lender) is entered into by Borrower with Franchisor or a replacement Franchisor acceptable to

Lender, all related property improvement requirements have been completed and paid for in full and Lender has received an acceptable comfort letter from such Franchisor.

provided that each Cash Management Trigger Event Cure set forth above shall be subject to the following conditions: (1) after giving effect to such Cash Management Trigger Event Cure, no Cash Management Trigger Event shall have occurred and remain outstanding, (2) Borrower shall have notified Lender in writing of its election to cure the applicable Cash Management Trigger Event, and (3) Borrower shall have paid all of Lender's reasonable costs and expenses incurred in connection with such Cash Management Trigger Event Cure (including reasonable attorneys' fees and expenses).

"**Cash Management Trigger Event Period**" shall mean any period commencing on the occurrence of a Cash Management Trigger Event and continuing until the earlier of (i) the Payment Date following the date that no Cash Management Trigger Event shall have occurred and be continuing or (ii) the payment in full of all principal and interest on the Loan and all other amounts payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents.

"**Cash Sweep DSCR Trigger Event**" shall mean that, as of any date on which Lender determines the Debt Service Coverage Ratio, the Debt Service Coverage Ratio based on the trailing twelve (12) month period immediately preceding the date of such determination is less than 1.10 to 1.00.

"**Cash Sweep Event**" shall mean the occurrence of:

      (i)     an Event of Default;

      (ii)    any Bankruptcy Action of Borrower;

      (iii)   any Bankruptcy Action of Guarantor;

      (iv)   any Bankruptcy Action of Manager;

      (v)    a Cash Sweep DSCR Trigger Event; or

      (vi)   the occurrence of a Franchise Trigger Event.

"**Cash Sweep Event Cure**" shall mean:

      (i)     if the Cash Sweep Event is caused solely by the occurrence of clause (i) in the definition of "Cash Sweep Event," a cure of the Event of Default which is accepted or waived in writing by Lender which gave rise to such Cash Sweep Event; provided that Lender shall not have exercised any of its rights under the Security Instrument to accelerate the Loan, move to appoint a receiver or commence a foreclosure action;

(ii)     if the Cash Sweep Event is caused solely by the occurrence of clause (ii) in the definition of "Cash Sweep Event," if such Cash Sweep Event is as a result of the filing of an involuntary petition against Borrower with respect to which neither Borrower, Guarantor nor any Affiliate of Borrower or Guarantor solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed within thirty (30) days of such filing; *provided* that (A) in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially increase Borrower's monetary obligations and (B) Borrower is not in breach of the provisions set forth in Sections 4.1.12 or 8.5 of this Agreement;

(iii)    if the Cash Sweep Event is caused solely by the occurrence of clause (iii) in the definition of "Cash Sweep Event," if such Cash Sweep Event is as a result of the filing of an involuntary petition against Guarantor with respect to which neither Guarantor nor any Affiliate of Guarantor solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed within thirty (30) days of such filing; *provided* that, in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially and adversely affect Guarantor's ability to perform its obligations under the Loan Documents to which it is a party;

(iv)     if the Cash Sweep Event is caused solely by the occurrence of clause (iv) in the definition of "Cash Sweep Event," (A) if Borrower replaces Manager with a new Manager acceptable to Lender in accordance with the Assignment of Management Agreement, or (B) if such Cash Sweep Event is as a result of the filing of an involuntary petition against Manager to which Manager did not consent, upon the same being discharged, stayed or dismissed within one hundred twenty (120) days of such filing; provided that, in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially and adversely affect Manager's ability to perform its obligations under the Management Agreement;

(v)      if the Cash Sweep Event is caused solely by the occurrence of clause (v) in the definition of "Cash Sweep Event," once the Debt Service Coverage Ratio based upon the trailing twelve (12) month period immediately preceding the date of such determination is greater than 1.15 to 1.00 for two (2) consecutive quarters; and

(vi)     if the Cash Sweep Event is caused solely by the occurrence of clause (vi) in the definition of "Cash Sweep Event," a Franchise Trigger Event, a new Franchise Agreement acceptable to Lender (or extension of the existing Franchise Agreement acceptable to Lender) is entered into by Borrower with Franchisor or a replacement Franchisor acceptable to Lender, all related property improvement requirements have been completed and paid

for in full and Lender has received an acceptable comfort letter from such Franchisor.

provided that each Cash Sweep Event Cure set forth above shall be subject to the following conditions: (1) after giving effect to such Cash Sweep Event Cure, no Cash Sweep Event shall have occurred and remain outstanding, (2) Borrower shall have notified Lender in writing of its election to cure the applicable Cash Sweep Event, and (3) Borrower shall have paid all of Lender's reasonable costs and expenses incurred in connection with such Cash Sweep Event Cure (including reasonable attorneys' fees and expenses).

"**Cash Sweep Event Period**" shall mean any period commencing on the occurrence of any Cash Sweep Event and continuing until the earlier of (i) the Payment Date following the date that no Cash Sweep Event shall have occurred and be continuing or (ii) the payment in full of all principal and interest on the Loan and all other amounts payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents.

"**Casualty**" shall have the meaning set forth in Section 5.2 hereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 5.4(b)(iii) hereof.

"**Casualty Retainage**" shall have the meaning set forth in Section 5.4(b)(iv) hereof.

"**Clearing Account**" shall have the meaning set forth in Section 6.1.1.

"**Clearing Account Activation**" shall have the meaning set forth in Section 6.1.1.

"**Clearing Account Activation Documentation**" shall have the meaning set forth in Section 6.1.1.

"**Clearing Account Agreement**" shall mean any depository account control agreement between Clearing Account Bank, Borrower and Lender with respect to the Clearing Account and any lockbox established in connection therewith in a form acceptable to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Clearing Account Bank**" shall mean Wells Fargo Bank, National Association, or any successor thereto designated in accordance with the terms of Sections 6.1.2(b) or 6.1.2(c) hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in Section 5.4(b) hereof.

"**control**" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"**Credit Card Company**" shall have the meaning set forth in Section 6.1.2(a).

"**Credit Card Instruction Notice**" shall have the meaning set forth in Section 6.1.2(a).

"**Debt**" shall mean the Outstanding Principal Balance, together with all interest accrued and unpaid thereon and all other sums payable to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"**Debt Service**" shall mean the scheduled monthly principal and interest payments due and payable under the Note (but assuming, for the purpose of calculating the Debt Service Coverage Ratio, that the Debt Service was based on the Applicable Interest Rate and an amortization period of thirty years).

"**Debt Service Coverage Ratio**" shall mean as of any date of determination, the ratio, as determined by Lender for the applicable period, in which:

(i)     the numerator is the Net Operating Income (excluding interest on credit accounts and using annualized operating expenses for any recurring expenses not paid monthly) for such period as set forth in financial statements required hereunder (and if the applicable period is less than twelve (12) months, the Net Operating Income for such period shall be annualized), without deduction for (a) actual management fees incurred in connection with the operation of the Property, (b) actual franchise fees incurred in connection with the operation of the Property, or (c) actual amounts paid to the Reserve Funds, less (1) management fees equal to the greater of (A) assumed management fees of three percent (3.0%) of Gross Income from Operations and (B) the actual management fees incurred, (2) franchise fees equal to the greater of (A) assumed franchise fees of seven percent (7.0%) of Gross Income from Operations and (B) the actual franchise fees incurred, and (3) contributions to the Capital Expenditure Account contributions for such period based on an assumed annual amount equal to $1,216.00 per hotel room at the Property; and

(ii)    the denominator is the annual Debt Service.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) five percent (5%) above the Applicable Interest Rate.

"**Defeasance Collateral**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Defeasance Date**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Defeasance Deposit**" shall mean an amount sufficient to purchase U.S. Obligations necessary to meet the Scheduled Defeasance Payments, pay any costs and expenses incurred or to be incurred in the purchase of U.S. Obligations necessary to meet the Scheduled Defeasance Payments and pay any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of Section 2.4 hereof.

"**Defeasance Event**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Defeasance Security Agreement**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Disclosure Document**" shall have the meaning set forth in Section 8.2 hereof.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (or subaccounts thereof) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts (or subaccounts thereof) maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by S&P, "P-1" by Moody's, and "F-1" by Fitch in the case of accounts in which funds are held for·thirty (30) days or less or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A" by Fitch and S&P and "A2" by Moody's.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**Event of Default**" shall have the meaning set forth in Section 7.1 hereof.

"**Excess Cash Flow**" shall have the meaning set forth in the Cash Management Agreement.

"**Excess Cash Flow Account**" shall have the set forth in Section 6.9.1 hereof.

"**Excess Cash Flow Funds**" shall have the meaning set forth in Section 6.9.1 hereof.

"**Exchange Act**" shall have the meaning set forth in Section 8.2 hereof.

"**Exchange Act Filing**" shall mean a filing pursuant to the Exchange Act in connection with or relating to a Securitization.

"**Extraordinary Lease Payments**" shall mean any amounts paid to Borrower in connection with a termination, cancellation, surrender, modification, sale or other disposition of any Lease or any portion thereof, other than amounts paid for rent and other charges in respect of periods prior to the date of such termination, cancellation, surrender, modification, sale or other disposition.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Franchise Agreement**" shall mean that certain License Agreement, dated as of the date hereof, between Borrower and Franchisor, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms and provisions of this Agreement, or, if the context requires, any replacement franchise agreement approved by Lender in accordance with the terms of this Agreement.

"**Franchise Trigger Event**" shall mean (x) the Franchise Agreement shall expire or terminate for any reason or (y) the date that occurs twelve (12) months prior to the then current expiration date of the Franchise Agreement.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever of any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"**Gross Income from Operations**" shall mean all income and proceeds (whether in cash or on credit and computed on an accrual basis) received by Borrower or Manager for the use, occupancy or enjoyment of the Property, or any part thereof, or received by Borrower or Manager for the sale of any goods, services or other items sold on or provided from the Property in the ordinary course of the Property operation, including without limitation: (i) all income and proceeds received from Leases and rental of rooms, commercial space and meeting, conference and/or banquet space within the Property (including net parking revenue); (ii) all income and proceeds received from food and beverage operations and from catering services conducted from the Property even though rendered outside of the Property; (iii) all income and proceeds from business or rental interruption or other loss of income insurance and use and occupancy insurance with respect to the operation of the Property (after deducting therefrom all costs and expenses incurred in the adjustment or collection thereof); (iv) all Awards for temporary use (after deducting therefrom all costs and expenses incurred in the adjustment or collection thereof and in Restoration of the Property); (v) all income and proceeds from judgments, settlements and

other resolutions of disputes with respect to matters which would be includable in this definition of "Gross Income from Operations" if received in the ordinary course of the Property operation (after deducting therefrom all costs and expenses incurred in the adjustment or collection thereof); and (vi) interest on credit accounts, rent concessions or credits, and other required pass-throughs and interest on Reserve Funds; but excluding, (a) gross receipts received by lessees, licensees or concessionaires of the Property; (b) consideration received at the Property for hotel accommodations, goods and services to be provided at other hotels, although arranged by, for or on behalf of Borrower or Manager; (c) income and proceeds from the sale or other disposition of goods, capital assets and other items not in the ordinary course of the Property operation; (d) federal, state and municipal excise, sales, use or other taxes collected directly from patrons or guests of the Property as a part of or based on the sales price of any goods, services or other items, such as gross receipts, room, admission, cabaret or equivalent taxes; (e) Awards (except to the extent provided in clause (iv) above); (f) refunds of amounts not included in Operating Expenses at any time and uncollectible accounts; (g) gratuities collected by the Property employees; (h) the proceeds of any financing; (i) other income or proceeds resulting other than from the use or occupancy of the Property, or any part thereof, or other than from the sale of goods, services or other items sold on or provided from the Property in the ordinary course of business; and (j) any credits or refunds made to customers, guests or patrons in the form of allowances or adjustments to previously recorded revenues.

"**Guaranty**" shall mean that certain Guaranty of Recourse Obligations, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Improvements**" shall have the meaning set forth in Article 1 of the Security Instrument with respect to the Property.

"**Indebtedness**" shall mean, for any Person, without duplication, any debt or liability, secured or unsecured, direct or contingent (including any guaranty).

"**Indemnified Liabilities**" shall have the meaning set forth in Section 9.13 hereof.

"**Indemnified Parties**" shall mean Lender and any person or entity who is or will have been involved in the origination of the Loan, any person or entity who is or will have been involved in the servicing of the Loan, any person or entity in whose name the encumbrance created by the Security Instrument is or will have been recorded and persons and entities who may hold or acquire or will have held a full or partial interest in the Loan, including, but not limited to, custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan.

"**Insolvency Opinion**" shall mean any bankruptcy non-consolidation opinion letter delivered to Lender in connection with the Loan.

"**Insurance Account**" shall have the meaning set forth in Section 6.4.1 hereof.

"**Insurance Funds**" shall have the meaning set forth in Section 6.4.1 hereof.

"**Insurance Premiums**" shall have the meaning set forth in Section 5.1(b) hereof.

"**Insurance Proceeds**" shall have the meaning set forth in <u>Section 5.4(b)</u> hereof.

"**Investor**" shall have the meaning set forth in <u>Section 8.1(b)</u> hereof.

"**Leases**" shall have the meaning set forth in Article 1 of the Security Instrument.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities at any time affecting the Loan, any Secondary Market Transactions, Borrower, Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act, the Exchange Act, Regulations AB, S-K and S-X under the Securities Act, the rules and regulations promulgated pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws, the Americans with Disabilities Act of 1990, as amended, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, Guarantor or the Property or any part thereof, including, without limitation, any which may (y) require repairs, modifications or alterations in or to the Property or any part thereof or (z) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any direct or indirect interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Assignment of Management Agreement, the Guaranty, the Clearing Account Agreement, the Cash Management Agreement and all other documents executed and/or delivered in connection with the Loan.

"**Losses**" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to reasonable out-of-pocket attorneys' fees and other costs of defense).

"**Major Lease**" shall mean any Lease. Notwithstanding anything contained herein to the contrary, the usage of hotel units or banquet, meeting or food and beverage space substantially in accordance with the current ordinary course of operations of the Property shall not constitute a "Major Lease".

"**Management Agreement**" shall mean any management agreement entered into between Borrower and Manager, pursuant to which the Manager is to provide management and other services with respect to the Property, or, if the context requires, the Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, Guarantor or the Property, (ii) the ability of Borrower or Guarantor to perform its obligations under any Loan Document to which it is a party, (iii) the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Document or the rights, interests and remedies of Lender under any Loan Document or (iv) the value, use or operation of the Property or the cash flows from the Property.

"**Material Agreements**" shall mean (i) each management, franchise, brokerage or leasing agreement (other than the Management Agreement and the Franchise Agreement), and (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than the Leases) of a material nature (materiality for purposes of this definition shall include, without limitation, any contract with a term longer than one year or any contract that is not cancelable on thirty (30) days' or less notice without the payment of any termination fee or payments of any kind), in either case relating to the ownership, development, leasing, management, use, operation, maintenance, repair, improvement or restoration of the Property, whether written or oral.

"**Maturity Date**" shall mean the Stated Maturity Date, or such other date on which the final payment of the principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall have the meaning set forth in Section 8.4 hereof.

"**Mezzanine Loan**" shall have the meaning set forth in Section 8.4 hereof.

"**Minimum Disbursement Amount**" shall mean Twenty-Five Thousand and No/100 Dollars ($25,000.00).

"**Monthly Insurance Deposit**" shall have the meaning set forth in Section 6.4.1 hereof.

"**Monthly Tax Deposit**" shall have the meaning set forth in Section 6.3.1 hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Net Cash Flow**" for any period shall mean the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"**Net Operating Income**" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period.

"**Net Proceeds**" shall have the meaning set forth in Section 5.4(b) hereof.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 5.4(b)(vi) hereof.

"**Note**" shall mean that certain promissory note of even date herewith in the original principal amount of the Loan, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**NRSRO**" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged in connection with, or in anticipation of, a Securitization.

"**Obligations**" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

"**OFAC**" shall mean the Office of Foreign Assets Control or, if the context requires, any successor Governmental Authority.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of Borrower.

"**Operating Agreements**" shall mean, collectively, any easements (including any reciprocal easement agreement) covenants, restrictions or agreements of record relating to the construction, operation or use of the Property.

"**Operating Expenses**" shall mean, for any period, the sum of all costs and expenses of operating, maintaining, directing, managing and supervising the Property (excluding (i) depreciation and amortization, (ii) any Debt Service, (iii) any Capital Expenditures, or (iv) the costs of any other things specified to be done or provided at Borrower's or Manager's sole cost and expense), incurred by Borrower or Manager pursuant to the Management Agreement, or as otherwise specifically provided therein, which are properly attributable to such period under Borrower's system of accounting, including, without limitation:  (a) the cost of all food and beverages sold or consumed and of all necessary chinaware, glassware, linens, flatware, uniforms, utensils and other items of a similar nature, including such items bearing the name or identifying characteristics of the hotel as Borrower and/or Manager shall reasonably consider appropriate (collectively, the "**Operating Equipment**") and paper supplies, cleaning materials and similar consumable items (collectively, the "**Operating Supplies**") placed in use (other than reserve stocks thereof in storerooms).  Operating Equipment and Operating Supplies shall be considered to have been placed in use when they are transferred from the storerooms of the

Property to the appropriate operating departments; (b) salaries and wages of personnel of the Property, including costs of payroll taxes and employee benefits (which benefits may include, without limitation, a pension plan, medical insurance, life insurance, travel accident insurance and an executive bonus program) and the costs of moving (1) employees of the Property whose primary duties consist of the management of the Property or of a recognized department or division thereof; or (2) personnel (A) who customarily and regularly direct the work of five (5) or more other employees of the Property, (B) who have authority with reference to the hiring, firing and advancement of other employees of the Property, (C) who customarily and regularly exercise discretionary powers, (D) who devote at least ninety five percent (95%) of their work time to activities which are directly and closely related to the performance of the work described in clauses (A) through (C) of clause (2) of this sentence, and (E) who are not compensated on an hourly basis (the "**Executive Hotel Personnel**"), their families and their belongings to the area in which the Property is located at the commencement of their employment at the Property and all other expenses not otherwise specifically referred to in this definition which are referred to as "Administrative and General Expenses" in the Uniform System of Accounts.  If the Executive Hotel Personnel are on the payroll of Guarantor or any Affiliate of Guarantor, the cost of their salaries, payroll taxes and employee benefits (which benefits, in the case of employees who are not United States citizens or in the case of employees of hotels located outside the continental United States may include, without limitation, in addition to the foregoing benefits, reasonable home leave transportation expenses approved by Lender) shall be billed by said Affiliate to and be reimbursed by Borrower and/or Manager monthly, and such reimbursement shall be an Operating Expense.  Except as otherwise expressly provided under the Management Agreement with respect to employees regularly employed at the Property, the salaries or wages of other employees or executives of Manager, Guarantor or any of their respective Affiliates shall in no event be Operating Expenses, but they shall be entitled to free room and board and the free use of all facilities at such times as they visit the Property exclusively in connection with the management of the Property.  Notwithstanding the foregoing, if it becomes necessary for an employee or executive of Guarantor or an employee or executive of any Affiliate of Guarantor to temporarily perform services at the Property of a nature normally performed by personnel of the Property, his or her salary (including payroll taxes and employee benefits) as well as his or her traveling expenses will be Operating Expenses and he or she will be entitled to free room, board and use of the facilities as aforesaid, while performing such services; (c) the cost of all other goods and services obtained by Borrower or Manager in connection with its operation of the Property, including, without limitation, heat and utilities, office supplies and all services performed by third parties, including leasing expenses in connection with telephone and data processing equipment, and all existing and any future installations necessary for the operation of the Improvements for hotel purposes (including, without limitation, heating, lighting, sanitary equipment, air conditioning, laundry, refrigerating, built-in kitchen equipment, telephone equipment, communications systems, computer equipment and elevators), Operating Equipment and existing and any future furniture, furnishings, wall coverings, fixtures and hotel equipment necessary for the operation of the Property for hotel purposes which shall include all equipment required for the operation of kitchens, bars, laundries (if any), and dry cleaning facilities (if any), office equipment, cleaning and engineering equipment and vehicles; (d) the cost of repairs to and maintenance of the Property other than of a capital nature; (e) Insurance Premiums for general liability insurance, workers' compensation insurance or insurance required by similar employee benefits acts and such business or rental interruption or other loss of income insurance as may be

provided for protection against claims, liabilities and losses arising from the operation of the Property (as distinguished from any property damage insurance on the Property or its contents) and losses incurred on any self-insured risks of the foregoing types, provided that (1) Lender has specifically approved in advance such self-insurance or (2) insurance is unavailable to cover such risks.  Premiums on policies will be pro rated over the period of insurance and premiums under blanket policies will be allocated among properties covered; (f) all Taxes and Other Charges (other than federal, state or local income taxes and franchise taxes or the equivalent) payable by or assessed against Borrower or Manager with respect to the operation of the Property; (g) legal fees and fees of any firm of independent certified public accounts designated from time to time by Borrower (the "**Independent CPA**") for services directly related to the operation of the Property; (h) the costs and expenses of technical consultants and specialized operational experts for specialized services in connection with non-recurring work on operational, legal, functional, decorating, design or construction problems and activities, including the reasonable fees of Guarantor, any Affiliate of Guarantor or any subsidiary or division of Guarantor or any Affiliate of Guarantor in connection therewith, provided that such employment of Guarantor, any Affiliate of Guarantor or of any such subsidiary or division of Guarantor or any Affiliate of Guarantor is approved in advance by Lender; provided, however, that if such costs and expenses have not been included in a budget approved by Lender, then, if such costs exceed $5,000 in any one instance, the same shall be subject to approval by Lender; (i) all expenses for advertising the Property and all expenses of sales promotion and public relations activities; (j) all out-of-pocket expenses and disbursements determined by the Independent CPA to have been reasonably, properly and specifically incurred by Borrower, Manager, Guarantor or any of their respective Affiliates pursuant to, in the course of and directly related to, the management and operation of the Property under the Management Agreement. Without limiting the generality of the foregoing, such charges may include all reasonable travel, telephone, telegram, radiogram, cablegram, air express and other incidental expenses, but excluding costs relating to the offices maintained by Borrower, Manager, Guarantor, or any of their respective Affiliates other than the offices maintained at the Property for the management of the Property; (k) the cost of any reservations system, any accounting services or other group benefits, programs or services from time to time made available to properties in the Borrower's system; (l) the cost associated with any Leases; (m) any management fees, basic and incentive fees or other fees and reimbursables paid or payable to Manager under the Management Agreement; (n) any franchise fees or other fees and reimbursables paid or payable to Franchisor under the Franchise Agreement; and (o) all costs and expenses of owning, maintaining, conducting, directing, managing and supervising the operation of the Property to the extent such costs and expenses are not included above.

"**Organizational Documents**" shall mean, as to any Person, the organizational or governing documents of such Person, including the certificate of incorporation and by-laws with respect to a corporation; the certificate of formation or organization and operating agreement with respect to a limited liability company; and the certificate of limited partnership and partnership agreement with respect to a limited partnership.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**Patriot Act**" shall mean, collectively, all laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56), as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"**Payment Date**" shall mean the sixth (6th) day of each calendar month prior to the Maturity Date commencing on (i) the sixth (6th) day of the next succeeding calendar month after the date hereof if the Closing Date is on or prior to the eleventh (11th) day of a calendar month; or (ii) the sixth (6th) day of the second succeeding calendar month after the date hereof if the Closing Date is after the eleventh (11th) day of a calendar month.

"**Permitted Encumbrances**" shall have the meaning set forth in Section 3.1.5 hereof.

"**Permitted Investments**" shall have the meaning set forth in the Cash Management Agreement.

"**Permitted Transfer**" shall mean any of the following:  (i) any transfer, directly as a result of the death of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by the decedent in question to the Person or Persons lawfully entitled thereto, (ii) any transfer, directly as a result of the legal incapacity of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by such natural person to the Person or Persons lawfully entitled thereto, (iii) any Lease of space in the Improvements to Tenants in accordance with the terms and provisions of Section 4.1.6 hereof, (iv) any Transfer permitted without Lender's prior consent in accordance with the terms and provisions of Section 4.1.12 hereof, (v) Permitted Encumbrances, (vi) any transfer by a natural person to trusts for estate planning purposes for the benefit of his or her immediate family member, and (vii) the sale, transfer or removal of worn out or obsolete personal property in the ordinary course of owning and operating the Property, provided that the same is promptly replaced with the similar property of equal or greater value to the extent reasonably necessary in connection the operation of the Property.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**PIP**" shall mean that certain Property Improvement Plan dated August 23, 2016 and any other property improvement plan required by Franchisor (or any replacement franchisor) pursuant to the terms of the Franchise Agreement or in connection with any extension, renewal or replacement thereof in accordance with the terms of this Agreement.

"**PIP Reserve Account**" shall have the meaning set forth in Section 6.11.1 hereof.

"**PIP Reserve Funds**" shall have the meaning set forth in Section 6.11.1 hereof.

"**PIP Work**" shall have the meaning set forth in <u>Section 6.11.1</u> hereof.

"**Policy**" or "**Policies**" shall have the meaning set forth in <u>Section 5.1(b)</u> hereof.

"**Prohibited Person**" shall means any Person subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., the Patriot Act, the Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated under any such legislation, including those related to Specially Designated Nationals and Specially Designated Global Terrorists or listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Executive Orders.

"**Property**" shall mean each parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to the Property and Improvements, as more particularly described in Article 1 of the Security Instrument and referred to therein as the "Property".

"**Provided Information**" shall have the meaning set forth in <u>Section 8.2</u> hereof.

"**Purchase Contract**" shall have the meaning set forth in <u>Section 3.1.22</u> hereof.

"**Qualified Manager**" shall mean, in the reasonable judgment of Lender, a reputable and experienced manager (which may be an Affiliate of Borrower) which possesses experience in managing properties similar in location, size, class, use, operation and value as the Property.

"**Rating Agencies**" shall mean any NRSRO, including those designated by Lender to assign a rating to the Securities.

"**Rating Agency Confirmation**" shall mean written confirmation from each Rating Agency designated by Lender to assign a rating to any Securities that any particular act or omission shall not result in downgrade, withdrawal or qualification of the then current ratings assigned to any ratings of the Securities or the proposed rating of any Securities. In the event that, at any given time, no Rating Agency has elected to consider whether to grant or withhold such an affirmation, then the term "Rating Agency Confirmation" shall be deemed instead to require the written approval of Lender based on its good faith determination of whether the Rating Agencies would issue a Rating Agency Confirmation; provided that the foregoing good faith standard shall be inapplicable in any case in which Lender has an independent approval right in respect of the matter at issue pursuant to the terms of this Agreement.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"**Rents**" shall have the meaning set forth in Article 1 of the Security Instrument have respect to the Property.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance, and (b) an assignment of management agreement substantially in the form of the Assignment of Management Agreement (or such other form reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**Replacement Note**" shall have the meaning set forth in Section 8.4 hereof.

"**Required Repair Account**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Required Repair Funds**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Required Repairs**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender.

"**Restricted Party**" shall mean, collectively, (i) Borrower, any SPC Party, any Affiliated Manager and Guarantor and (ii) any shareholder, partner, member, non-member manager or any other direct or indirect legal or beneficial owner of Borrower, any SPC Party, any Affiliated Manager, Guarantor or any non-member manager.

"**RIALTO**" shall have the meaning set forth in Section 8.2 hereof.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"**Scheduled Defeasance Payments**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Securities**" shall have the meaning set forth in Section 8.1 hereof.

"**Securities Act**" shall have the meaning set forth in Section 8.2 hereof.

"**Securitization**" shall have the meaning set forth in Section 8.1 hereof.

"**Securitization Indemnification Liabilities**" shall have the meaning set forth in Section 8.2 hereof.

"**Securitization Indemnified Parties**" shall have the meaning set forth in Section 8.2 hereof.

"**Security Instrument**" shall mean that certain first priority mortgage, deed of trust or deed to secure debt, as applicable, assignment of leases and rents, fixture filing and security

agreement, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicer**" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"**Servicing Agreement**" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"**Settlement Statement**" shall have the meaning set forth in <u>Section 3.1.22</u> hereof.

"**Single Purpose Entity**" shall have the meaning set forth in <u>Schedule I</u> hereof.

"**SPC Party**" shall have the meaning set forth on <u>Schedule I</u> hereof.

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Successor Borrower**" shall have the meaning set forth in <u>Section 2.5.1(c)</u> hereof.

"**Survey**" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"**Tax Account**" shall have the meaning set forth in <u>Section 6.3.1</u> hereof.

"**Tax Funds**" shall have the meaning set forth in <u>Section 6.3.1</u> hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Tenant Instruction Notice**" shall have the meaning set forth in <u>Section 6.1.2(a)</u>.

"**Title Insurance Policy**" shall mean, with respect to the Property, an ALTA mortgagee title insurance policy in a form acceptable to Lender (or, if the Property is located in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the lien of the Security Instrument encumbering the Property.

"**Transfer**" shall have the meaning set forth in <u>Section 4.1.12</u> hereof.

"**Transferee**" shall have the meaning set forth in <u>Section 4.1.12(f)</u> hereof.

"**Transferee's Sponsors**" shall mean, with respect to any Transferee, such Transferee's shareholders, partners, members or non-member managers that, directly or indirectly, (i) own

twenty- percent (20%) or more of legal, beneficial and economic interests in such Transferee or (ii) are in control of such Transferee.

"**Treasury Rate**" shall mean, at the time of the prepayment, as applicable, the rate of interest per annum equal to the yield to maturity (converted by Lender to the equivalent monthly yield using Lender's then system of conversion) of the United States Treasury obligations selected by the holder of the Note having maturity dates closest to, but not exceeding, the remaining term to the Free Window Date.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State or, if the context requires, in the State of Texas.

"**U.S. Obligations**" shall mean (i) direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption or (ii) to the extent acceptable to the Rating Agencies, other "government securities" within the meaning of Treasury Regulations Section 1.860G-2(a)(8)(ii).

"**Yield Maintenance Default Premium**" shall mean an amount equal to the greater of: (i) three percent (3%) of the principal amount of the Loan being repaid and (ii) the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being repaid provided that the Note shall be deemed, for purposes of this definition, to be due and payable on the Free Window Date, over (b) the principal amount of the Loan being repaid.

"**Yield Maintenance Premium**" shall mean an amount equal to the greater of: (i) one percent (1%) of the principal amount of the Loan being prepaid and (ii) the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being prepaid provided that the Note shall be deemed, for purposes of this definition, to be due and payable on the Free Window Date, over (b) the principal amount of the Loan being prepaid.

Section 1.2    Principles of Construction.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II.    GENERAL TERMS

Section 2.1    Loan.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date. Borrower may request and receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

The Loan shall be evidenced by the Note and secured by the Security Instrument, the Assignment of Leases and the other Loan Documents.

Section 2.2   Interest; Payments; Late Payment Charge.

2.2.1   Interest.   Interest on the Outstanding Principal Balance shall accrue from and including the Closing Date to and including the last day of the Accrual Period in which the Maturity Date occurs at the Applicable Interest Rate. Upon the occurrence and during the continuance of an Event of Default, interest on the Outstanding Principal Balance and, to the extent permitted under applicable Legal Requirements, overdue interest in respect of the Loan, shall accrue at the Default Rate. The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full.  Nothing contained herein shall be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default. Interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year by (c) the Outstanding Principal Balance. Borrower hereby acknowledges that interest is to be calculated by Lender on the basis of a three hundred sixty (360) day year and is fully aware that such calculations may result in an accrual and/or payment of interest in amounts greater than corresponding interest calculations based on a three hundred sixty-five (365) day year.

2.2.2   Payments Before Maturity Date.   If the Closing Date is not the eleventh (11th) day of a month, Borrower shall make a payment to Lender of interest only on the Closing Date for the initial Accrual Period. The Monthly Debt Service Payment Amount shall be paid by Borrower to Lender on each Payment Date. Each Monthly Debt Service Payment Amount shall be applied first to the payment of interest that has accrued or is scheduled to accrue during the Accrual Period in which the related Payment Date occurs, and the balance, if any, shall be applied to the reduction of the Outstanding Principal Balance. Lender shall have the right to change the Payment Date to any other day of a calendar month selected by Lender, in its sole and absolute discretion (including in connection with a Securitization) upon notice to Borrower (in which event such change shall then be deemed effective) and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change; provided that if Lender shall have elected to change the Payment Date as aforesaid, Lender shall have the option, but not the obligation, to adjust the Accrual Period accordingly.

2.2.3   Payment on Maturity Date.   Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all interest which has accrued and is scheduled to accrue through and including the last day of the Accrual Period in which the Maturity Date occurs and all other amounts payable to Lender hereunder and under the Note, the Security Instrument and the other Loan Documents.  In the event Lender changes the Payment Date in accordance with this Agreement, the Maturity Date shall also be deemed to have been changed such that the Maturity Date and the Payment Date shall occur on the same calendar day and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change.

2.2.4   Late Payment Charge.  If any principal, interest or any other sums due under the Loan Documents (other than the Outstanding Principal Balance due and payable on the Maturity Date) is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted under applicable Legal Requirements in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by applicable Legal Requirements. Nothing contained herein shall be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

2.2.5   Usury Savings.  This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable Legal Requirements, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

Section 2.3   Prepayments.

2.3.1   Voluntary Prepayments.  Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part. From and after the Free Window Date, Borrower may, at its option and upon thirty (30) days prior written notice to Lender, prepay the Debt in whole (but not in part) without payment of the Yield Maintenance Premium, provided that Borrower pays to Lender (i) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date), and (ii) all other sums due and payable under this Agreement, the Note and the other Loan Documents. If a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.3.1, the amount designated for prepayment and all other sums required under this Section 2.3 shall be due and payable on the proposed prepayment date.

2.3.2   Mandatory Prepayments.  On each date on which Lender actually receives any Net Proceeds, if Lender is not obligated to and elects not to make such Net Proceeds available to Borrower for the restoration of the Property, Borrower shall prepay the Outstanding Principal Balance in an amount equal to one hundred percent (100%) of such Net Proceeds. No Yield

Maintenance Premium shall be due in connection with any prepayment made pursuant to this Section 2.3.2.

2.3.3   Prepayments After Default.  If, following an Event of Default, payment of all or any part of the Debt is tendered by Borrower or otherwise recovered by Lender, such tender or recovery shall be deemed a voluntary prepayment by Borrower in violation of the prohibition against prepayment set forth in Section 2.3.1 and Borrower shall pay, in addition to the Debt, (i) an amount equal to the Yield Maintenance Default Premium, (ii) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date), and (iii) all other sums due and payable under this Agreement, the Note and the other Loan Documents.

2.3.4   Prepayment Prior to Permitted Defeasance Date.  If the Permitted Release Date has occurred but the Permitted Defeasance Date has not occurred, Borrower may, at its option and upon thirty (30) days prior written notice to Lender, prepay the Debt in whole (but not in part), provided that Borrower pays to Lender (i) the Yield Maintenance Premium, (ii) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date), and (iii) all other sums due and payable under this Agreement, the Note and the other Loan Documents. Lender shall notify Borrower of the amount and the basis of determination of the required prepayment consideration. If a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.3.4, the amount designated for prepayment and all other sums required under this Section 2.3 shall be due and payable on the proposed prepayment date. Lender shall not be obligated to accept any prepayment of the Debt unless it is accompanied by the prepayment consideration due in connection therewith.

Section 2.4   Making of Payments.  Except as otherwise specifically provided herein, all payments and prepayments under this Agreement, the Note and the other Loan Documents shall be made to Lender not later than 2:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day succeeding such scheduled due date. All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

Section 2.5   Defeasance.

2.5.1   Voluntary Defeasance.   (a)   Provided no Event of Default shall then exist, Borrower shall have the right at any time after the Permitted Defeasance Date and prior to the Free Window Date to voluntarily defease the entire Loan by and upon satisfaction of the

following conditions (such event being a "**Defeasance Event**"): (i) Borrower shall provide not less than thirty (30) days prior written notice to Lender specifying the date (the "Defeasance Date") on which the Defeasance Event is to occur; (ii) Borrower shall pay to Lender (1) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the Defeasance Date (or, if the Defeasance Date occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date) and (2) all other sums then due and payable under the Note, this Agreement, the Security Instrument and the other Loan Documents; (iii) Borrower shall have delivered, or caused to be delivered, to Lender the Defeasance Deposit; (iv) intentionally omitted; (v) Borrower shall execute and deliver a security agreement, in form and substance reasonably satisfactory to Lender, creating a first priority lien on the Defeasance Collateral purchased with the Defeasance Deposit in accordance with the provisions of this Section 2.5 (the "**Defeasance Security Agreement**"); (vi) Borrower shall deliver an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions stating, among other things, that Borrower has legally and validly transferred and assigned the Defeasance Collateral and all obligations, rights and duties under and to the Note to the Successor Borrower, that Lender has a perfected first priority security interest in the Defeasance Collateral delivered by Borrower and that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such Defeasance Event; (vii) Borrower shall deliver a Rating Agency Confirmation, and, if required by the applicable Rating Agencies, Borrower shall also deliver or cause to be delivered an Insolvency Opinion with respect to the Successor Borrower in form and substance reasonably satisfactory to Lender and the applicable Rating Agencies; (viii) Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.5.1(a) have been satisfied; (ix) Borrower shall deliver a certificate of Borrower's independent certified public accountant certifying that the U.S. Obligations purchased with the Defeasance Deposit generate monthly amounts equal to or greater than the Scheduled Defeasance Payments; (x) Borrower shall deliver such other certificates, documents or instruments as Lender may reasonably request; (xi) Borrower shall have paid to Lender any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this Section 2.5; and (xii) Borrower shall pay all out of pocket costs and expenses of Lender incurred in connection with the Defeasance Event, including any costs and expenses associated with a release of the Lien of the Security Instrument as provided in Section 2.5.2 hereof, as well as reasonable attorneys' fees and expenses, and Rating Agency fees, costs and expenses, if any.

(b)     In connection with a Defeasance Event, Borrower hereby appoints Lender as its agent and attorney-in-fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations (the "**Defeasance Collateral**") which provide payments on or prior to, but as close as possible to, all successive scheduled payment dates after the Defeasance Date upon which interest and principal payments are required under the Note (including the Stated Maturity Date, as accelerated pursuant to the succeeding sentence) and in amounts equal to the scheduled payments due on such dates under this Agreement and the Note (including without limitation scheduled payments of principal and interest) (the "**Scheduled Defeasance Payments**"). Simultaneously with the delivery of the Defeasance Collateral and the satisfaction of all other conditions to the defeasance of the Loan set forth herein, the Stated Maturity Date

shall be accelerated to the Free Window Date. Each of the U.S. Obligations that are part of the Defeasance Collateral shall be duly endorsed by the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance that would be satisfactory to a prudent institutional lender (including, without limitation, such instruments as may be required by the depository institution holding such securities or by the issuer thereof, as the case may be, to effectuate book entry transfers and pledges through the book entry facilities of such institution) in order to perfect upon the delivery of the Defeasance Collateral a first priority security interest therein in favor of Lender in conformity with all applicable state and federal laws governing the granting of such security interests. Borrower, pursuant to the Defeasance Security Agreement or other appropriate document, shall authorize and direct that the payments received from the Defeasance Collateral may be made directly to the Cash Management Account (unless otherwise directed by Lender) and applied to satisfy the obligations of Borrower under the Note. Any portion of the Defeasance Deposit in excess of the amount necessary to purchase the Defeasance Collateral required by this Section 2.5 and satisfy Borrower's other obligations under this Section 2.5 shall be promptly remitted to Borrower.

(c)     In connection with any Defeasance Event, Lender, its designee or, at Lender's election, Borrower, shall establish or designate a successor entity (the "**Successor Borrower**") which shall be a single purpose bankruptcy remote entity under criteria established by the Rating Agencies, and Borrower shall transfer and assign all obligations, rights and duties under and to the Note together with the pledged U.S. Obligations to such Successor Borrower. Such Successor Borrower shall assume the obligations under the Note and the Defeasance Security Agreement and Borrower shall be relieved of its obligations under such documents and Guarantor shall be released from any liability under the Guaranty for acts and omissions first occurring after said assumption. Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Defeasance Security Agreement. Notwithstanding anything in this Agreement to the contrary, no assumption fee shall be payable upon a transfer of the Note in accordance with this Section 2.5.1(c), but Borrower shall pay all costs and expenses incurred by Lender, including Lender's reasonable attorneys' fees and expenses, incurred in connection therewith.

2.5.2   Release of Property. (a) Except as set forth in this Section 2.5.2 or in Section 2.6, no repayment, prepayment or defeasance of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of any Lien of the Security Instrument on the Property.  If Borrower has elected to defease the entire Loan and the requirements of Section 2.5.1 have been satisfied, the Property shall be released from the Lien of the Security Instrument and the Defeasance Collateral, pledged pursuant to the Defeasance Security Agreement, shall be the sole source of collateral securing the Note.  In connection with the release of the Security Instrument, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date, a release of Lien (and related Loan Documents) for the Property for execution by Lender.  Such release shall be in a form appropriate in the jurisdiction in which the Property is located and that would be satisfactory to a prudent lender.  In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such releases in accordance with the terms of this Agreement.

Section 2.6    Release on Payment in Full. Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Loan Agreement, release the Lien of the Security Instrument on the Property.

## III.    REPRESENTATIONS AND WARRANTIES

Section 3.1    Borrower Representations. Borrower represents and warrants as of the Closing Date that:

3.1.1    Organization. Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the State; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted and proposed to be conducted. Borrower now has and shall continue to have the full right, power and authority to operate and lease the Property, to encumber the Property as provided herein and to perform all of the other obligations to be performed by Borrower under the Note, this Agreement, the Security Instrument and the other Loan Documents. Borrower's principal place of business and chief executive office is and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change). Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is 802549708. Borrower's federal tax identification number is 81-4152874. The organizational chart attached hereto as Schedule II is true, correct and complete on and as of the date hereof. No Person, other than those Persons shown on Schedule II, has any ownership interest in, or right of control, directly or indirectly, in Borrower.

3.1.2    Authority. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Agreement, the Note, the Security Instruments and the other Loan Documents, and to mortgage, grant, bargain, sell, pledge, assign, warrant, set-over, transfer and convey the Property pursuant to the terms of the Loan Documents and to keep and observe all of the terms of the Loan Documents on Borrower's part to be performed.

3.1.3    Validity of Documents. (a) The execution, delivery and performance of this Agreement, the Note, the Security Instrument and the other Loan Documents and the borrowing evidenced by the Note (i) are within the corporate, partnership, trust or limited liability company (as the case may be) power of Borrower; (ii) have been authorized by all requisite corporate, partnership, trust or limited liability company (as the case may be) action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by laws, partnership, trust, operating agreement or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a

party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created by the Loan Documents; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby); and (b) this Agreement, the Note, the Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set off, counterclaim or defense by Borrower, any SPC Party, or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally and, as to enforceability, to principles of equity), and neither Borrower, any SPC Party nor Guarantor has asserted any right of rescission, set off, counterclaim or defense with respect thereto.

3.1.4   Litigation.   There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, any SPC Party, Guarantor or the Property that could have a Material Adverse Effect.

3.1.5   Warranty of Title.   Borrower has paid for and has good title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, set over, transfer and convey the same and that Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all Liens, encumbrances and charges whatsoever (including, without limitation, liens securing a PACE Loan) except (i) the Liens created by the Loan Documents, (ii) Liens, encumbrances and other exceptions shown in the title insurance policy insuring the lien of the Security Instrument and (iii) Liens, if any, for Taxes not yet due or delinquent (the "**Permitted Encumbrances**"). The Security Instrument, together with any Uniform Commercial Code financing statements required to be filed in connection therewith (when properly recorded and/or filed, as applicable, in the appropriate records) will create (a) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances, and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances. All personal property necessary to operate the Property in the manner it is currently operated is owned by Borrower and included within the Property encumbered by the Security Instrument. The Permitted Encumbrances do not and will not, individually or in the aggregate, materially adversely affect or interfere with the value, current use or operation of the Property, the security intended to be provided by the Security Instrument, or the ability of Borrower to pay or perform its obligations when due in accordance with the Note or the other Loan Documents. Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of the Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

3.1.6   <u>Property Status and Condition</u>. (a) No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, or any successor law, or, if located within any such area, Borrower has obtained and will maintain the insurance prescribed in <u>Section 5.1</u>; (b) Borrower has obtained all necessary certificates, licenses, permits and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar certificates, licenses, permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification; (c) to the best of Borrower's knowledge, the Property and the present and contemplated use and occupancy thereof comply in all material respects with all Legal Requirements, including, without limitation, zoning ordinances, building codes, land use and environmental laws, laws relating to the disabled (including, but not limited to, the Americans With Disabilities Act of 1990, as amended) and other similar laws; (d) the Property is served by all utilities (including, but not limited to, public water and sewer systems) required for the current or contemplated use thereof; (e) all utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service; (f) to the best of Borrower's knowledge, all public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all weather and are physically and legally open for use by the public; (g) the Property is in good repair and free of any material damage, waste or defective condition, and to Borrower's knowledge, free from damage caused by fire, water, wind or other casualty or any previous damage to the Property has been fully restored; (h) to the best of Borrower's knowledge, all costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full; (i) to the best of Borrower's knowledge, all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and comply in all material respects with all Legal Requirements; (j) all Improvements lie within the boundary of the Land; (k) no Condemnation or other similar proceeding has been commenced or, to Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property; (l) the Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property; (m) there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments; (n) the Property is used exclusively for hotel purposes and other appurtenant and related uses; (o) no portion of the Property has been or will be purchased with proceeds of any illegal activity and, to Borrower's knowledge, there are no illegal activities at the Property; and (p) Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which Borrower or the Property is bound.

3.1.7   <u>Leases</u>. (a) The rent roll attached hereto as <u>Schedule III</u> is true, correct and complete in all material respects and the Property is not subject to any Leases other than the Leases described in <u>Schedule III</u>; (b) the Leases identified on <u>Schedule III</u> are in full force and effect and there are no defaults thereunder by any party thereto and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder; (c)

the copies of the Leases delivered to Lender are true, correct and complete, and there are no oral agreements with respect thereto; (d) no Rent (including security or other deposits) has been paid more than two (2) months in advance of its due date; (e) all work to be performed by the landlord under each Lease has been performed as required and has been accepted by the applicable Tenant; (f) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the landlord to any Tenant has already been received by such Tenant, and (without limitation to the foregoing) all tenant improvement, tenant allowance, leasing commission costs (other than leasing commissions related to unexercised renewal options) and other amounts required to be paid in connection with commencement of the lease term or rent commencement have been paid; (g) all security or other deposits are being held in accordance with the applicable Leases and all applicable Legal Requirements; (h) Borrower has no knowledge of any notice of termination or default with respect to any Lease; (i) Borrower has not assigned or pledged any of the Leases, the rents or any interest therein except to Lender; (j) no Tenant or other Person has an option, right of first refusal or offer or any other preferential right to purchase all or any portion of, or interest in, the Property; (k) no Tenant has any right or option for additional space in the Improvements; (l) to Borrower's knowledge, no Tenant has assigned its Lease or sublet all or any portion of the premises demised thereby; (m) except as set forth in the Lease, no Tenant has the right to terminate its Lease prior to expiration of the stated term of such Lease; (n) intentionally omitted; and (o) all existing Leases are subordinate to the Security Instrument either pursuant to their terms or a recorded subordination agreement. The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, as more particularly set forth therein. No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

3.1.8   Solvency.   Borrower is solvent, has received reasonably equivalent value for entering into this Agreement and the other Loan Documents, and, immediately after the Loan is made, will have sufficient working capital, including cash flow from the Property or other assets, not only to adequately maintain the Property, but also to pay all of Borrower's outstanding debts as they come due. No petition under any state or federal bankruptcy or insolvency laws has ever been filed against Borrower, any SPC Party, Guarantor or any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own ten percent (10%) or more of the legal, beneficial or economic interests in Borrower, any SPC Party or Guarantor. Neither Borrower, any SPC Party, Guarantor, nor any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own ten percent (10%) or more of the legal, beneficial or economic interests in Borrower, any SPC Party or Guarantor is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's or such Person's assets or properties.

3.1.9   Financial Information.   All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of the Property or otherwise in connection with the Loan (i) are true, correct and complete in all material respects, and (ii) accurately represent the financial condition of Borrower and the Property, as applicable, as of the date of such reports. Borrower has no liabilities or other obligations that arose or accrued prior to the date hereof that, either

individually or in the aggregate, could have a Material Adverse Effect. Borrower has no known contingent liabilities. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

3.1.10 Not a Foreign Person. Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

3.1.11 Filing and Recording Taxes. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid.

3.1.12 Franchise Agreement. The Franchise Agreement is in full force and effect, all franchise fees, reservation fees, royalties and other sums due thereunder have been paid in full to date, and neither Borrower nor Franchisor is in default thereunder.

3.1.13 Management Agreement. Borrower has not engaged a Manager or entered into any Management Agreement, and no Person is entitled to a property management fee..

3.1.14 Material Agreements and Operating Agreement. Each Material Agreement and Operating Agreement is in full force and effect and neither Borrower nor, to Borrower's knowledge, any other party to any Material Agreement or Operating Agreement, is in default thereunder, and to Borrower's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default under any Material Agreement or Operating Agreement. Borrower has delivered true, correct and complete copies of the Material Agreements (including all amendments and supplements thereto) to Lender.

3.1.15 ERISA Compliance. As of the date hereof and throughout the term of the Loan, (i) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA; (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; and (iv) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans. Borrower shall deliver to Lender such certifications or other evidence as requested by Lender from time to time of Borrower's compliance with the foregoing representations and covenants.

3.1.16 Business Purposes. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

3.1.17 Taxes. Borrower has filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities

which have become due pursuant to such returns or pursuant to any assessments received by it. Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

3.1.18 OFAC. Borrower represents and warrants that neither Borrower, Guarantor, or any of their respective Affiliates or, to Borrower's knowledge, any other Person owning a direct or indirect equity interest in Borrower or, if Guarantor is not a natural Person, Guarantor, is a Prohibited Person, and Borrower, Guarantor, and their respective Affiliates and, to Borrower's knowledge, each other Person owning a direct or indirect equity interest in Borrower or, if Guarantor is not a natural Person, Guarantor, are in compliance in all material respects with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury and the Patriot Act.

3.1.19 Intentionally Omitted.

3.1.20 No Change in Facts or Circumstances; Disclosure. No information contained in this Agreement, the other Loan Documents, or any written statement or document furnished by or on behalf of Borrower in connection with the Loan or pursuant to the terms of this Agreement or any other Loan Document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which could have a Material Adverse Effect. All information submitted by or on behalf of Borrower to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan and all statements of fact made by or on behalf of Borrower in this Agreement or in any other Loan Document, are true, correct and complete in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information or statement of fact inaccurate, incomplete or otherwise misleading in any material respect or that otherwise has or could have a Material Adverse Effect.

3.1.21 Intentionally Omitted.

3.1.22 Acquisition Documents. Borrower has delivered to Lender a true, correct and complete copy of the agreement pursuant to which Borrower is acquiring the Property on the date hereof (including all amendments thereto) (the "**Purchase Contract**") and the settlement statement (the "**Settlement Statement**") setting forth all payments, credits and prorations associated with the purchase of the Property by Borrower. There is no other agreement (other than the Purchase Contract) related to the sale, transfer or conveyance of the Property to Borrower. The Settlement Statement constitutes a true, complete and correct statement of all payments, credits, prorations and other consideration related to the sale of the Property to Borrower.

3.1.23 Discounted Payoff. In the event that proceeds from the Loan are being used directly or indirectly to pay off or refinance any mortgage, mezzanine or other similar debt (in whole or in part) that is in default or is the subject of a discounted payoff, Borrower hereby represents and warrants to Lender that each of Borrower, Guarantor and each of their respective and applicable Affiliates (including the borrower(s) of such debt) has complied with all the terms

and conditions of any documentation or agreement relating to such default or discounted payoff and has provided to the holder of such debt all information and documentation relating to the Property, Borrower, Guarantor and each of their respective and applicable Affiliates (including the borrower(s) of such debt) (i) required to be so provided or (ii) necessary for the holder of such debt to make an informed decision as to any discounted payoff amount.

Section 3.2   Survival of Representations.   Borrower agrees that all of the representations and warranties of Borrower set forth in Section 3.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower.

## IV.   BORROWER COVENANTS

Section 4.1   Covenants.  Borrower hereby covenants and agrees with Lender that:

4.1.1   Existence; Compliance with Legal Requirements.  (a) Borrower will continuously maintain its existence and its rights to do business in the State together with its franchises and trade names, and will keep in full force and effect all material licenses, permits and applicable governmental authorizations necessary for the continued use and operation of the Property. Without limitation to the foregoing, Borrower shall (i) promptly comply and cause Guarantor and the Property to comply with all existing and future Legal Requirements (hereinafter defined), (ii) from time to time, upon Lender's request, provide Lender with evidence satisfactory to Lender that the Property complies with all Legal Requirements or is exempt from compliance with Legal Requirements, (iii) give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements, and (iv) take appropriate measures to prevent and will not engage in or knowingly permit any illegal activities at the Property.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Legal Requirements; (iii) neither the Property nor any material part thereof or interest therein will reasonably be in danger of being sold, forfeited, terminated, cancelled or lost as a result of such contest; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith.  Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

4.1.2   <u>Taxes and Other Charges</u>.  Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable (provided, however, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of <u>Section 6.3</u>). Borrower shall furnish to Lender receipts, or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to <u>Section 6.3</u>).  Except for Permitted Encumbrances and for Liens contested in accordance with this <u>Section 4.1.2</u>, Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Legal Requirements; (iii) neither the Property nor any material part thereof or interest therein will reasonably be in danger of being sold, forfeited, terminated, cancelled or lost as a result of such contest; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may apply such security or part thereof held by Lender at any time when, in the judgment of Lender, the validity or applicability of such Tax or Other Charges is established or the Property (or material part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien the Security Instrument being primed by any related Lien.

4.1.3   <u>Maintenance of Property</u>.  Borrower shall cause the Property to be maintained in a good and safe condition and repair, ordinary wear and tear excepted.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of the Security Instrument. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender. Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) with any portion of the Property which may be deemed to constitute personal property, or any other action or procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or

charged to the Property or any portion thereof. The Property shall be used only for hotel use and other appurtenant and related uses, and for no other use without the prior written consent of Lender.

4.1.4   Financial Reporting.  (a)  Borrower shall keep and maintain, or shall cause to be kept and maintained, in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property.  All financial statements delivered to Lender pursuant to this Section 4.1.4 shall be prepared in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) and consistently applied.

(b)     Prior to a Securitization, Borrower shall furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar month the following items, accompanied by an Officer's Certificate stating that such items are true, correct and complete  in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) an occupancy report for the subject month, including an average daily rate, and any franchise inspection reports received by Borrower during such month; (ii) monthly and year-to-date operating statements prepared for such month, noting Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income, Net Cash Flow and such other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such month, all in form reasonably satisfactory to Lender; and (iii) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such month for the immediately preceding twelve (12) month period. On or before thirty (30) days after the end of each calendar month, Borrower also will furnish, or cause to be furnished, to Lender the most current Smith Travel Research Reports then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property.

(c)     Borrower shall furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items, accompanied by an Officer's Certificate stating that such items are true, correct and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable:  (i) an occupancy report for the subject quarter, including an average daily rate and franchise inspection reports; (ii) (A) a balance sheet for Borrower as of the last day of such quarter and (B) quarterly and year-to-date operating statements prepared for such quarter, noting Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income, Net Cash Flow and such other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such quarter, all in form reasonably satisfactory to Lender; and (iii) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such quarter for such quarter for the last four quarters.

(d)     Borrower shall furnish, or cause to be furnished, to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements prepared and reviewed by an independent

certified public accountant reasonably acceptable to Lender in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income and Net Cash Flow. Borrower's annual financial statements shall be accompanied by (i) an Officer's Certificate stating that each such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property being reported upon in all material respects and has been prepared in accordance with Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender), and (ii) occupancy statistics for the Property.

(e)     Each such financial statement shall be in scope and detail reasonably satisfactory to Lender and certified by the chief financial officer or representative of Borrower. Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette, and (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form reasonably acceptable to Lender. Lender shall have the right from time to time at all times during normal business hours and upon reasonable prior written notice to Borrower to examine such books, records and accounts at the office of Borrower or other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence and during a continuance of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(f)     For the partial year period commencing on the date hereof, and for each Fiscal Year thereafter, Borrower shall submit to Lender an annual operating budget presented on a monthly basis consistent with the quarterly and annual operating statements described above for the Property, including cash flow projections for the upcoming year, and all proposed Capital Expenditures at least fifteen (15) days prior to the start of each Fiscal Year.

(g)     Borrower shall furnish to Lender, within five (5) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(h)     If Borrower fails to provide to Lender the financial statements and other information specified in this Section 4.1.4 within the respective time period specified, then, in addition to any other rights and remedies Lender may have herein or under applicable law, Borrower shall pay to Lender a fee in the amount of $5,000 immediately upon the occurrence of such failure and again upon the expiration of each 30-day period thereafter until compliance is achieved, which amounts shall constitute a portion of the Obligations and, if unpaid, shall accrue interest at the Default Rate.

4.1.5   <u>Litigation</u>.   Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened in writing against the Property, Borrower or any Guarantor which, if adversely determined, is reasonably likely to have a Material Adverse Effect.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

4.1.6   <u>Leasing Matters</u>.  (a)  All Leases and all renewals of Leases executed after the date hereof shall (i) provide for economic terms, including rental rates, comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms, (iii) have a term of not less than three (3) years (unless Lender approves in writing a shorter term), (iv) have a term of not more than fifteen (15) years, including all extensions and renewals (unless Lender approves in writing a longer term), (v) provide that such Lease is subordinate to the Security Instrument and the Assignment of Leases and that the Tenant thereunder will attorn to Lender and any purchaser at a foreclosure sale, (vi) be arms-length transactions with bona fide, independent third party tenants, (vii) be written substantially in accordance with a standard form of Lease which shall have been approved in writing by Lender (subject to any commercially reasonable changes made in the course of negotiations with the applicable Tenant), (viii) not be with any Affiliate of Borrower, Guarantor or Manager, and (ix) not contain any option to purchase, any right of first option to purchase, or any right of first refusal to purchase; provided that, in connection with renewals of Leases existing on the date hereof, any applicable term that would otherwise breach the requirements set forth in this <u>Section 4.1.6(a)</u> shall be permitted to the extent necessary to implement a renewal term expressly contained in the applicable Lease and with respect to which Borrower has no discretion.

(b)     Borrower (i) shall perform the obligations which Borrower is required to perform under the Leases; (ii) shall enforce in a commercially reasonable manner the obligations to be performed by the Tenants thereunder (short of termination thereof); (iii) shall promptly furnish to Lender any notice of default or termination received by Borrower from any Tenant, and any notice of default or termination given by Borrower to any Tenant; (iv) shall not collect any Rents for more than one (1) month in advance of the time when the same shall become due, except for bona fide security deposits not in excess of an amount equal to two (2) months' rent; (v) shall not enter into any ground Lease or master Lease of any part of the Property; (vi) shall not further assign or encumber any Lease or the Rents (except as contemplated by the Loan Documents); (vii) shall not, except with Lender's prior consent, cancel or accept surrender or termination of any Lease; and (viii) shall not, except with Lender's prior consent, modify or amend any Lease (except, solely with respect to Leases that are not Major Leases, for modifications and amendments entered into in the ordinary course of business, consistent with prudent property management practices, not affecting the economic terms of the applicable Lease, and which result in a Lease in conformance with the provisions of <u>Section 4.1.6(a)</u> above).  Any action in violation of clause (v), (vi), (vii) or (viii) of this <u>Section 4.1.6(b)</u> shall be void at the election of Lender.

(c)     All Major Leases and all renewals, modifications and amendments thereof (other than renewals, modifications and amendments strictly limited to the implementation of options or rights expressly contained in Major Leases and with respect to

which Borrower has no discretion as to the terms thereof) executed after the date hereof shall be subject to Lender's prior approval.

(d)     Borrower shall not permit or consent to any assignment or sublease of any Major Lease without Lender's prior approval (other than any assignment or sublease expressly permitted under a Major Lease pursuant to a unilateral right of Tenant thereunder not requiring the consent of Borrower).

(e)     Upon Borrower's request and at Borrower's sole cost and expense, Lender shall execute and deliver its standard form of subordination, non-disturbance and attornment agreement to Tenant under any future Major Lease approved or deemed approved by Lender, with such commercially reasonable changes as may be requested by such Tenant and which are acceptable to Lender.

(f)     Borrower shall pay or reimburse Lender for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Lender in connection with the review of any matter requiring Lender's consent under this Section 4.1.6.

(g)     Within ten (10) days after Lender's request, Borrower shall furnish to Lender a statement of all tenant security or other deposits and copies of all Leases not previously delivered to Lender, certified as being true, correct and complete.

(h)     All security deposits of Tenants, whether held in cash or any other form, shall be held in compliance with all applicable Legal Requirements and shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at such commercial or savings bank or banks as may be reasonably satisfactory to Lender. Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing.  Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Property, to be held by Lender subject to the terms of the Leases.

4.1.7   Alterations.  Lender's prior approval shall be required in connection with any alterations to the Property (a)(i) that could have a Material Adverse Effect, (ii) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold, or (iii) that could materially and adversely affect any structural component of any Improvements, any utility or HVAC system at the Property or the exterior of any building constituting a part of any Improvements or (b) any alterations to the Property during the continuation of any Event of Default. Any alteration to the Property shall be done and completed by Borrower in a good and workmanlike fashion and in compliance with all applicable Legal Requirements.  If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Property shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (A) cash, (B) letters of credit (in form and from an issuer acceptable to Lender), or (C) U.S.

Obligations.  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases; provided that the applicable Leases shall be in full force and effect) over the Alteration Threshold, and, at Lender's option, Lender shall have the right to apply such security from time to time to pay for such alterations. Upon substantial completion of any alteration to the Property, Borrower shall provide evidence reasonably satisfactory to Lender that (1) such alteration was constructed in accordance with all applicable Legal Requirements, (2) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with such alteration have been paid in full and have delivered unconditional releases of liens (unless a dispute exists and Borrower is contesting the lien in good faith and in compliance with Section 4.1.2 hereof), and (3) all licenses and permits necessary for the use, operation and occupancy of the Improvements have been issued, provided that, if any such license or permit is temporary in nature, Borrower shall diligently pursue procuring a permanent license or permit from the applicable Governmental Authority.

    4.1.8   Management Agreement.

    Borrower shall not engage a Manager or enter into a Management Agreement without Lender's prior written consent. In the event Borrower retains a Manager and enters into a Management Agreement with Lender's consent pursuant to the immediately preceding sentence, then the following subsections (a) and (b) shall be applicable.

    (a) Borrower shall cause the Property to be operated in accordance with the Management Agreement. Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (ii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Management Agreement and (iv) promptly enforce the performance and observance of all of the terms, covenants and conditions required to be performed and/or observed by Manager under the Management Agreement, in a commercially reasonable manner. If Borrower shall default in the performance or observance of any term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder, under the other Loan Documents or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed in all material respects. Borrower shall not, without prior consent of Lender, (1) surrender, terminate, cancel, modify, renew, amend, or extend the Management Agreement; provided that Borrower may, without Lender's consent, replace Manager with a Qualified Manager pursuant to a Replacement Management Agreement, (2) reduce or consent to the reduction of the term of the Management Agreement, (3) increase or consent to the increase of the amount of any fees or other charges under the Management Agreement, or (4) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect.  In connection with the replacement of Manager with a

Qualified Manager, Borrower shall execute and cause Qualified Manager to execute an assignment of management agreement and subordination of management fees in the form then used by Lender. In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a Replacement Management Agreement with a Qualified Manager. Upon the occurrence and during the continuation of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior consent of Lender.

(b)     Without limitation to the foregoing, if (i) an Event of Default has occurred and is continuing, (ii) Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (iii) Manager shall become insolvent or a debtor in any Bankruptcy Action, (iv) at any time Manager has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds, and/or (v) at any time the Debt Service Coverage Ratio (based upon the trailing twelve (12) month period immediately preceding the date of such determination) is less than 1.25 to 1.00, Borrower shall, at Lender's request, terminate the Management Agreement and replace Manager with a Qualified Manager pursuant to a Replacement Management Agreement, it being understood and agreed that the management fee for such Qualified Manager shall not exceed then prevailing market rates.

4.1.9   Franchise Agreement.   Borrower shall cause the Property to be operated in accordance with the Franchise Agreement.   Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of the Franchise Agreement on the part of Borrower to be performed and observed, (ii) promptly notify Lender of any default under the Franchise Agreement of which it is aware, (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Franchise Agreement, and (iv) promptly enforce the performance and observance of all of the terms, covenants and conditions required to be performed and/or observed by Franchisor under the Franchise Agreement, in a commercially reasonable manner.   If Borrower shall default in the performance or observance of any term, covenant or condition of the Franchise Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder, under the other Loan Documents or under the Franchise Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause the terms, covenants and conditions of the Franchise Agreement on the part of Borrower to be performed or observed in all material respects. Borrower shall not, without prior consent of Lender, (1) surrender, terminate, cancel, modify, renew, amend, or extend the Franchise Agreement, (2) reduce or consent to the reduction of the term of the Franchise Agreement, (3) increase or consent to the increase of the amount of any fees or other charges under the Franchise Agreement, or (4) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under the Franchise Agreement in any material respect. In the event that the Franchise Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Franchise Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a new franchise agreement in form and substance acceptable to Lender with a franchisor acceptable to Lender. Upon the

occurrence and during the continuation of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Franchise Agreement without the prior consent of Lender. Borrower shall reimburse Lender for any out of pocket fees and expenses incurred by Lender in connection with the transfer or reissuance of any subordination agreement, comfort letter or similar agreement with any Franchisor in connection with the transfer of the Loan.

4.1.10   Intentionally Omitted.

4.1.11   Performance of Other Agreements.   Borrower shall observe and perform in all material respects each and every term to be observed or performed by Borrower pursuant to the terms of any Operating Agreements and Material Agreements.   Without limitation to the foregoing, Borrower shall (a) give prompt notice to Lender of any notice received by Borrower under any of the Material Agreements or Operating Agreements, together with a complete copy of any such notice, (b) enforce, short of termination thereof, the performance and observance of each and every term, covenant and provision of the Material Agreements or Operating Agreements to be performed or observed, if any, (c) not terminate or amend any of the terms or provisions of any Material Agreement or Operating Agreement, without the prior written consent of Lender and (d) not enter into any Material Agreement or Operating Agreement; provided, however, Lender's consent shall not be required with respect to (x) the execution of a Material Agreement on an arm's length basis and on commercially reasonable terms, (y) a termination of any Material Agreement if the other party thereto is in material default and the termination of such agreement would be commercially reasonable or (z) any amendment or waiver of any term or provision of any Material Agreement entered on an arm's length basis and on commercially reasonable terms. In the event a Material Agreement terminates by its terms, with Lender's consent or pursuant to clause (z), Borrower shall enter into a replacement thereof that is negotiated on arm's length basis and contains commercially reasonable terms (except that no replacement shall be required where the related service or subject matter is no longer required or relevant to the use, operation or enjoyment of the Property).   Borrower shall notify Lender in the event Borrower does not replace the terminated Material Agreement.

4.1.12   Transfers.   (a)   Without the prior consent of Lender, neither Borrower nor any Restricted Party shall do any of the following (each, a "**Transfer**"): sell, transfer, convey, assign, mortgage, pledge, encumber, alienate, grant a Lien on, grant any option with respect to or grant any other interest in the Property, any part thereof or any interest therein (including any legal, beneficial or economic interest in Borrower or any Restricted Party), directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record, other than Permitted Transfers.

(b)   A Transfer shall include (i) an installment sales agreement wherein Borrower agrees to sell the Property, any part thereof or any interest therein for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Borrower or any Restricted Party is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or

issuance of new stock such that such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the control of such corporation; (iv) if Borrower or any Restricted Party is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a partner, joint venturer, manager or member, the voluntary or involuntary transfer of any partnership, joint venture, membership or manager interest or any change in the control of such limited or general partnership, joint venture or limited liability company; (v) if Borrower or any Restricted Party is a trust, the change or removal of any trustee of such trust, the voluntary or involuntary transfer of the legal or beneficial interest in such trust or the creation or issuance of new legal or beneficial interests or conversion of such trust from a revocable to an irrevocable trust; (vi) the transfer, assignment or pledge of any distribution or dividends of a stockholder, partner, venturer, member, manager or other beneficial owner of a Restricted Party; and (vii) if Borrower enters into, or the Property is subjected to, any PACE Loan.

(c)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder or under the other Loan Documents in order to declare the Debt immediately due and payable upon a Transfer (other than a Permitted Transfer) without Lender's prior consent. This provision shall apply to every Transfer regardless of whether voluntary or not, and whether or not Lender has consented to any previous Transfer.

(d)     No consent to any assumption of the Loan shall occur on or before earlier to occur of (1) the first (1st) anniversary of the date hereof and (2) the sixtieth (60th) day following the initial Securitization of the Loan. Thereafter, Lender's consent to a Transfer of the Property and the assumption of the Loan (in whole and not in part) shall not be unreasonably withheld after consideration of all relevant factors and provided that the following conditions are satisfied: (i) Lender shall have received a notice from Borrower requesting Lender's consent to such Transfer not less than forty-five (45) days prior to the proposed date of such Transfer; (ii) no Event of Default shall have occurred and remain outstanding; (iii) the proposed transferee ("**Transferee**") shall be a Single Purpose Entity (and shall not be a tenant in common structure, a Delaware statutory trust or a crowdfunded entity); (iv) the Organizational Documents of Transferee and any managing member or general partner thereof shall be reasonably satisfactory to Lender; (v) neither any Transferee's Sponsor, Transferee nor any other Person owned or controlled, directly or indirectly, by Transferee's Sponsors shall have been a party to any Bankruptcy Action or taken advantage of any Bankruptcy Law or any law for the benefit of debtors within seven (7) years prior to the date of the proposed Transfer; (vi) neither any Transferee's Sponsor, Transferee nor any other Person owned or controlled, directly or indirectly, by Transferee's Sponsors shall have defaulted under its obligations with respect to any Indebtedness in a manner which is not reasonably acceptable to Lender; (vii) there shall be no material litigation or regulatory action pending or threatened against any Transferee's Sponsor, Transferee or any other Person owned or controlled, directly or indirectly, by Transferee's Sponsors which is not reasonably acceptable to Lender; (viii) Transferee and Transferee's Sponsors shall, as of the date of such Transfer, have an aggregate net worth and liquidity reasonably satisfactory to Lender; (ix) Transferee and Transferee's Sponsors (together with Transferee's proposed property manager) shall be experienced owners and operators of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably satisfactory to Lender (it being understood and agreed that Lender reserves the right to approve Transferee without approving its

proposed property manager); (x) if the Management Agreement will be terminated as a result of such Transfer, the Property shall be managed by a Qualified Manager in accordance with a Replacement Management Agreement; (xi) if a Franchise Agreement is in effect, such Franchise Agreement will remain in full force and effect after giving effect to such Transfer (unless (1) Lender has consented to the termination of such Franchise Agreement in its sole and absolute discretion and (2) a new franchise agreement has been executed with the franchisor under the terminated Franchise Agreement or a new franchisor, which new franchise agreement and franchisor shall be reasonably acceptable to Lender; (xii) Transferee shall have delivered all agreements, certificates and opinions reasonably required by Lender (including, if applicable, an amendment to <u>Section 8.5</u> and/or <u>Schedule I</u> hereof to incorporate necessary changes based on differences in the organizational structures of Borrower and Transferee); (xiii) no Event of Default shall occur as a result of such Transfer; (xiv) Transferee shall have assumed all obligations of Borrower under the Loan Documents pursuant to an assumption agreement in form and substance reasonably satisfactory to Lender; (xv) Borrower shall have delivered, at its sole cost and expense, an endorsement to the Title Insurance Policy, as modified by the assumption agreement, as a valid first lien on the Property and naming Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any Liens other than those contained in the Title Insurance Policy issued on the date hereof and the Permitted Encumbrances; (xvi) one (1) or more Transferee's Sponsors reasonably acceptable to Lender having (x) a direct or indirect equity interest of twenty percent (20%) or more in Transferee, (y) control over Transferee and (z) an aggregate net worth and liquidity reasonably satisfactory to Lender shall (A) have assumed all obligations of Guarantor under the Guaranty and the Environmental Indemnity or (B) have executed a replacement guaranty and a replacement environmental indemnity in form and substance reasonably satisfactory to Lender; (xvii) intentionally omitted; (xviii) if required by Lender, Borrower shall have delivered a Rating Agency Confirmation as to such Transfer and Transferee; (xix) Borrower shall have paid to Lender an assumption fee equal to one percent (1%) of the Outstanding Principal Balance; and (xx) Borrower shall have paid all reasonable out-of-pocket costs and expenses incurred in connection with such Transfer (including reasonable fees and disbursements of Lender's counsel and fees, costs and expenses of the Rating Agencies).

(e) Notwithstanding anything to the contrary contained in this <u>Section 4.1.12</u>, Lender's consent shall not be required in connection with Transfers of the direct or indirect ownership interests in any Restricted Party (x) that do not result in a Transfer of more than forty-nine percent (49%), in the aggregate, of the direct or indirect ownership interests in Borrower or (y) to an immediate family member (i.e., parents, spouses, siblings, children or grandchildren) of an owner of such interest (or a trust for the benefit of any such person(s)) for estate planning purposes; provided that the following conditions are satisfied: (i) no Event of Default shall have occurred and remain outstanding or shall occur solely as a result of such Transfer, (ii) such Transfer shall not (1) cause the transferee, together with its Affiliates, to acquire control of Borrower, (2) result in any Borrower no longer being controlled by Key Principal, or (3) except in connection with a Transfer described in clause (y) above, cause the transferee, together with its Affiliates, to increase its direct or indirect interest in Borrower to an amount which exceeds forty-nine percent (49%) in the aggregate, (iii) to the extent the transferee owns twenty percent (20%) or more of the direct or indirect interests in Borrower immediately following such Transfer (provided that such Transferee did not own 20% or more of the direct or

indirect ownership interests in Borrower as of the Closing Date), Borrower shall deliver, at Borrower's sole cost and expense, customary searches (credit, judgment, lien, bankruptcy, etc.) reasonably acceptable to Lender with respect to such transferee and its Affiliates as Lender may reasonably require, (iv) after giving effect to such Transfer, Key Principal shall continue to own, directly or indirectly, at least fifty-one percent (51%) of all legal, beneficial and economic interests in Borrower, (v) Borrower shall give Lender notice of such Transfer request, together with copies of all instruments effecting such Transfer and copies of any Organizational Documents that Lender shall require, not less than thirty (30) days prior to the proposed date of such Transfer, and (vi) the legal and financial structure of Borrower and the single purpose nature and bankruptcy remoteness of Borrower, after such Transfer, shall satisfy Lender's the then current applicable underwriting criteria and requirements.

(f)     Lender's consent to one Transfer shall not be deemed to be a waiver of Lender's right to require such consent to any future occurrence of same. Any Transfer made in contravention of this Section 4.1.12 shall be null and void and of no force and effect.

(g)     Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and/or documentation of any proposed Transfer.  If required by Lender, Borrower shall deposit with Lender an amount equal to Lender's anticipated costs and expenses in evaluating any proposed Transfer.

4.1.13  Intentionally Omitted.

4.1.14  Patriot Act Compliance.  Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  Lender shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, Lender may, at its option, cause Borrower to comply therewith.  At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, any SPC Party or Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Prohibited Person, with the result that the investment in Borrower, any SPC Party or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law, or the Loan made by Lender would be in violation of law, (b) no Prohibited Person shall have any interest of any nature whatsoever in Borrower, any SPC Party or Guarantor, as applicable, with the result that the investment in Borrower, any SPC Party or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, any SPC Party or Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, any SPC Party or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law. All costs and expenses incurred by Lender in connection therewith shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the

date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender. All such indebtedness shall be secured by the Security Instrument.

4.1.15 <u>Debt Cancellation</u>. Borrower shall not cancel or otherwise forgive or release any material claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

4.1.16 <u>Name, Identity, Structure, or Principal Place of Business</u>. Borrower shall not change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Lender thirty (30) days prior written notice. Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth herein, except in the case of a Permitted Transfer, without, in each case, the consent of Lender. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

4.1.17 <u>Access to the Property</u>. Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, subject to the rights of tenants.

4.1.18 <u>Notice of Default</u>. Borrower shall promptly advise Lender of the occurrence of any Event of Default of which Borrower has knowledge.

4.1.19 <u>Further Assurances</u>. Borrower shall, at Borrower's sole cost and expense: (a) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Obligations, as Lender may reasonably require; and (b) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender shall reasonably require from time to time.

4.1.20 <u>Intentionally Omitted</u>.

4.1.21 <u>Estoppel Statement</u>. (a) After written request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (ii) the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)     Borrower shall use commercially reasonable efforts to deliver to Lender, within thirty (30) days after Lender's written request, an estoppel certificate from each Tenant under any Lease in form and substance reasonably satisfactory to Lender; provided that

(i) Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant not required to provide an estoppel certificate under its Lease, (ii) such estoppel certificate may be in the form required under such Lease, and (iii) Borrower shall not be required to deliver such estoppel certificate from any Tenant more frequently than two (2) times in any calendar year.

## V.   INSURANCE; CASUALTY; CONDEMNATION

Section 5.1     Insurance.     (a) Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)     comprehensive all risk insurance (including wind and named storms) on the Improvements and the personal property at the Property (A) in an amount equal to one hundred percent (100%) of the "full replacement cost" of the Property, which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and personal property at the Property waiving all co-insurance provisions; (C) providing for no deductible in excess of Ten Thousand and No/100 Dollars ($10,000) for all such insurance coverage, except for wind/named storms and earthquake which may provide for a deductible of five percent (5%) of the total insurable value of the Property; and (D) if any of the Improvements or the use of the Property shall at any time constitute a legal non-conforming structure or use, containing "law and ordinance" coverage including coverage for loss of the undamaged portion of the Improvements, demolition and increased costs of construction in an amount acceptable to Lender.  In addition, Borrower shall obtain: (1) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, plus such excess amount as Lender shall require; and (2) if the Property is located in seismic zone 3 or 4 and the PML/SEL of the Property exceeds twenty percent (20%), earthquake insurance in amounts and in form and substance satisfactory to Lender, provided that the insurance pursuant to clauses (1) and (2) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this Section 5.1(a)(i);

(ii)     broad form commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with an occurrence limit of not less than One Million and No/100 Dollars ($1,000,000) and an aggregate limit of not less than Two Million and No/100 Dollars ($2,000,000); (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards:  (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for all insured contracts; and (5) contractual liability covering the indemnities contained in Article 9 of the Security Instrument to the extent the same is available;

(iii)     business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by insurance pursuant to Sections 5.1(a)(i), (iv), (vi), (xi) and (xii) for a period commencing at the time of loss for such length of time as it takes to repair or replace with the exercise of due diligence and dispatch or the expiration of twelve (12) months, whichever first occurs, and notwithstanding that the Policy may expire prior to the end of such period; (C) in an amount equal to one hundred percent (100%) of the projected gross income (less non-continuing expenses) from the Property for a period of twelve (12) months; and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.  The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income (less non-continuing expenses) from the Property for the succeeding twelve (12) month period.  All proceeds payable to Lender pursuant to this Section 5.1(a)(iii) shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligation to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)     at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property and liability coverage forms do not otherwise apply, (A) commercial general liability and umbrella liability insurance covering claims related to construction, repair and alteration at the Property not covered by or under the terms or provisions of the commercial general liability insurance and umbrella liability insurance policies required under this Section 5.1; and (B) the insurance provided for in Section 5.1(a)(i) above written in a so-called builder's risk completed value form in amounts and with deductibles, terms and conditions required by Lender (1) on a non-reporting basis, (2) covering all risks required to be insured against pursuant to Sections 5.1(a)(i), (iii), (vi), (xi) and (xii), (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)     workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least One Million and No/100 Dollars ($1,000,000) per accident and per disease per employee, and One Million and No/100 Dollars ($1,000,000) for disease aggregate (if applicable);

(vi)     comprehensive boiler and machinery insurance in amounts required by Lender and on terms consistent with the insurance required under Section 5.1(a)(i) above (if applicable);

(vii)   umbrella liability insurance in addition to primary coverage in an amount not less than Fifteen Million and No/100 Dollars ($15,000,000.00) per occurrence on terms consistent with the insurance required under <u>Section 5.1(a)(ii)</u> and, if applicable, <u>(viii)</u>;

(viii)   commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles, containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000) (if applicable);

(ix)   liquor liability insurance or other liability insurance required in connection with the sale of alcoholic beverages (if applicable);

(x)   insurance against employee dishonesty in an amount required by Lender (if applicable);

(xi)   with respect to commercial property, general liability, business income, and umbrella liability insurance required under this <u>Section 5.1(a)</u> (including, if applicable, insurance required under <u>Section 5.1(a)(iv)</u> above), insurance for loss resulting from perils and acts of terrorism in amounts and with terms and conditions applicable to commercial property, general liability, business income, and umbrella liability insurance required under this Section 5.1(a). The policy or endorsement providing for such insurance shall be in form and substance satisfactory to Lender and shall satisfy Rating Agency criteria for securitized loans; and

(xii)   upon sixty (60) days' notice, such other insurance and in such amounts as Lender may, from time to time, reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(b)   All insurance provided for in Section 5.1(a) shall be obtained under valid and enforceable policies (each individually, a "**Policy**" and collectively, the "**Policies**") and, to the extent not specified above, shall be subject to the approval of Lender as to insurers, amounts, deductibles, loss payees and insureds. Not less than fifteen (15) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies (and, upon Lender's request, certified copies of such Policies or such other evidence as shall be acceptable to Lender) accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "**Insurance Premiums**") shall be delivered by Borrower to Lender.

(c)   Any blanket insurance Policy shall be subject to Lender's approval, which approval shall be conditioned upon, among other things, evidence satisfactory to Lender that such Policy provides the same protection as would a separate Policy insuring only the Property in compliance with the provisions of <u>Section 5.1(a)</u>.

(d)   All Policies of insurance provided for or contemplated by <u>Section 5.1(a)</u> shall be primary coverage and shall name Borrower as a named insured and, in the case of liability policies, except for the Policy referenced in <u>Section 5.1(a)(v)</u> and <u>(viii)</u>, Lender and its successors and/or assigns as the additional insured, as its interests may appear, and, in the case of

property insurance (including, but not limited to, flood, earthquake, boiler and machinery, and terrorism insurance), shall name Lender and its successors and/or assigns, as their interests may appear, as mortgagee pursuant to a non-contributing mortgagee clause (or its equivalent) in favor of Lender and its successors and/or assigns providing that the loss thereunder shall be payable to Lender and its successors and/or assigns.  Borrower shall not procure or permit any of its constituent entities to procure any other insurance coverage which would be on the same level of payment as the Policies or would adversely impact in any way the ability of Borrower or Lender to collect any proceeds under any of the Policies.

(e)     All property insurance provided for in Section 5.1(a) shall:  (a) provide that no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned; (b) provide that the Policy shall not be canceled or permitted to lapse without at least thirty (30) days' written notice to Lender, except ten (10) days' written notice for non-payment of premium; (c) not contain any provisions which would make Lender be liable for any Insurance Premiums thereon or subject to any assessments thereunder; and (d) provide that the issuers thereof shall give written notice to Lender if the issuer(s) of the Policies elect not to renew prior to its expiration.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all costs and expenses (including any Insurance Premiums) incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such indebtedness shall be secured by the Security Instrument.

(g)     In the event of foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Obligations, all right, title and interest of Borrower in and to the Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in Lender, the purchaser at such foreclosure or the transferee in the event of such other transfer of title.

(h)     The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A" or better by S&P. Notwithstanding the foregoing, Lender shall accept Western World Insurance Company, rated "A XV" with AM Best and currently not rated by S&P, as the insurer for the general liability Policy, United States Liability Insurance Company, rated A++ X with AM Best and is currently not rated by S&P, and Employers Preferred Insurance Company, rated "A-XI" and currently not rated with S&P, for so long as the rating of such insurers is not withdrawn or downgraded below the date hereof. In the event such insurer's rating is withdrawn

or downgraded below this rating, Borrower shall promptly notify Lender and replace such insurer with an insurer meeting the rating requirements set forth herein.

Section 5.2    Casualty. If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 5.4. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower. In the event of a Casualty where the loss and the applicable Net Proceeds are less than the Restoration Threshold, Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and remains outstanding and (b) such adjustment is carried out in a commercially reasonable and timely manner. In the event of a Casualty where the loss and the applicable Net Proceeds is equal to or greater than the Restoration Threshold or if an Event of Default has occurred and remains outstanding, Borrower may settle and adjust such claim only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost and expense, in any such adjustments.

Section 5.3    Condemnation. Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall, promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 5.4. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 5.4    Restoration. The following provisions shall apply in connection with the Restoration of the Property:

(a)    If the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, the Net

Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in <u>Section 5.4(b)(i)</u> are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)     If the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration is equal to or greater than the Restoration Threshold Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this <u>Section 5.4</u>. The term "**Net Proceeds**" shall mean:  (i) the net amount of all insurance proceeds received by Lender pursuant to Section 5.1(a)(i), (iv), (vi), (xi) and (xii) as a result of such damage or destruction (or any proceeds of self-insurance maintained in lieu of such insurance policies), after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("**Insurance Proceeds**"), or (ii) the net amount of the Award, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)     The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met:  (A) no Event of Default shall have occurred and remain outstanding; (B)(1) in the event the Net Proceeds are Insurance Proceeds, less than twenty five percent (25%) of the total floor area of the Improvements has been damaged, destroyed, or rendered unusable as a result of such fire or other casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property; (C) intentionally omitted; (D) Borrower shall have commenced the Restoration as soon as reasonably practicable (but in no event later than ninety (90) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion; (E) Lender shall be satisfied that any operating deficits and all scheduled payments under this Agreement and the other Loan Documents (including scheduled payments of principal and interest) will be paid during the period required for Restoration from (1) the Net Proceeds, (2) the Insurance Proceeds of the business or rental interruption or other loss of income insurance specified in Section 5.1(a)(iii) hereof or (3) other funds of Borrower; (F) Lender shall be satisfied that following the completion of the Restoration, the Debt Service Coverage Ratio shall not be less than 1.35: 1.00; (G) Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) the date that is six (6) months prior to the Stated Maturity Date, (2) intentionally omitted, (3) intentionally omitted, (4) the date required for such completion under the terms of the Franchise Agreement, (5) the date, if any, required under the applicable Legal Requirements for such completion, or (6) six (6) months prior to the expiration of the insurance coverage specified in <u>Section 5.1(a)(iii)</u> hereof; (H) the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements; (I) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements; (J) such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the Improvements; (K) the Franchise Agreement shall remain in full force and effect during and after the completion of the Restoration;

and (L) Lender shall be satisfied that, upon the completion of the Restoration, the loan-to-value ratio of the Loan (as so determined by Lender) shall not be greater than the lesser of (1) 67.0%, and (2) the loan-to-value ratio of the Loan (as so determined by Lender) immediately prior to such Casualty or Condemnation.

(ii)     The Net Proceeds shall be held by Lender in an interest bearing account and, until disbursed in accordance with the provisions of this Section 5.4(b), shall constitute additional security for the Debt and other obligations under the Loan Documents.  The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant. Borrower shall deliver, or cause to be delivered, to Lender a signed, detailed budget approved in writing by Borrower's architect or engineer stating all of the costs and expenses of completing the Restoration, which budget shall be acceptable to Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage.  The term "**Casualty Retainage**" shall mean an amount equal to ten percent (10%), of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed.   The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 5.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.4(b) and that all approvals necessary for the occupancy and use of the Property have been obtained from all appropriate

Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy for the Property, and Lender receives an endorsement to such Title Insurance Policy insuring the continued priority of the Lien of the Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, if any, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.4(b) shall constitute additional security for the Debt and other obligations under the Loan Documents.

(vii)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall exist.

(c)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 5.4(b)(vii) may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate, in its discretion. Provided no Event of Default exists, Borrower shall not be obligated to pay any prepayment premium or other

prepayment consideration in connection with a prepayment resulting from the application of Net Proceeds to the Debt pursuant to the preceding sentence.

(d)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the Lien of the Security Instrument following a Casualty or Condemnation (but taking into account any proposed Restoration of the remaining Property), the ratio of the unpaid principal balance of the Loan to the value of the remaining Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, based solely on real property and excluding any personal property and going concern value, if any), the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts:  (i) the Net Proceeds, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the loan to value ratio of the Loan (as so determined by Lender) does not increase after the release, unless Lender receives an opinion of counsel that if such amount is not paid, the applicable Securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Security Instrument.  If and to the extent the preceding sentence applies, only such amount of the Net Proceeds, if any, in excess of the amount required to pay down the principal balance of the Loan may be released for purposes of Restoration or released to Borrower as otherwise expressly provided in this Section 5.4.

## VI.   CASH MANAGEMENT AND RESERVE FUNDS

Section 6.1     Cash Management.

6.1.1   Clearing Account.   Upon the occurrence of a Cash Management Trigger Event, Borrower shall establish an account with Clearing Account Bank (the "**Clearing Account**") into which all Rents shall be deposited in accordance with Section 6.1.2(a) below.  The Clearing Account shall be an Eligible Account and shall be established under Borrower's federal tax identification number. On the date hereof, Borrower has delivered to Lender all executed account opening and activation documentation required by the Clearing Account Bank to open and activate the Clearing Account to be held by Lender until the occurrence of a Cash Management Trigger Event (the "**Clearing Account Activation Documentation**"). Upon the occurrence of a Cash Management Trigger Event, Lender is and shall be irrevocably authorized to submit the Clearing Account Activation Documentation to the Clearing Account Bank to open and activate the Clearing Account (the "**Clearing Account Activation**").  Borrower shall cooperate with Lender in opening and activating the Clearing Account, and shall provide promptly upon request such other account opening and activation documentation as may then be required by the Clearing Account Bank and/or Lender. Borrower acknowledges and agrees that the Clearing Account is and shall be subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof and the terms of the Clearing Account Agreement. The Clearing Account shall not be commingled with other monies held by Borrower or Clearing Account Bank. All costs and expenses for establishing and maintaining the Clearing Account shall be paid by Borrower.

6.1.2   Instruction Notices: Deposits.  (a) (i) Borrower shall, or shall cause Manager to, within five (5) Business Days after the occurrence of a Cash Management Trigger Event deliver

to each Tenant of the Property, and shall upon its entry into each new Lease following the occurrence of a Cash Management Trigger Event deliver to the Tenant thereunder, a notice in the form attached hereto as Exhibit A ("**Tenant Instruction Notice**"). Without limitation to the foregoing, on the date hereof, Borrower has delivered to Lender executed Instruction Notices with respect to each present Tenant of the Property, and, upon entering into each new Lease of the Property, Borrower shall prior to the first occurrence of a Cash Management Trigger Event deliver to Lender an executed Tenant Instruction Notice for to each Tenant thereunder. Tenant Instruction Notices delivered to Lender shall be held by Lender until the occurrence of a Cash Management Trigger Event. Borrower hereby ratifies and confirms that, from and after the occurrence of a Cash Management Trigger Event, any and all Rents due Borrower under any and all Leases shall be made payable to Clearing Account Bank in accordance with this Section 6.1.2. If Borrower fails to provide any such Tenant Instruction Notice (and without prejudice to Lender's rights with respect to such default), Lender shall have the right, and Borrower hereby grants to Lender a power of attorney (which power of attorney shall be coupled with an interest and irrevocable so long as any portion of the Debt remains outstanding), to sign, complete necessary account information and payment direction and deliver Tenant Instruction Notices to each Tenant thereunder if and to the extent Lender deems it necessary and without limitation to Borrower's obligation to provide Tenant Instruction Notices as set forth above. Without the prior written consent of Lender, so long as any portion of the Debt remains outstanding, neither Borrower nor Manager shall terminate, amend, revoke or modify any Tenant Instruction Notice delivered to Lender or any Tenant in any manner whatsoever or direct or cause any Tenant to pay any amount in any manner other than as provided in the related Tenant Instruction Notice. Borrower shall, or shall cause Manager to, from and after the occurrence of a Cash Management Trigger Event, cause each present and future Tenant of the Property to pay all Rents directly to the lockbox established in connection with the Clearing Account (if payment is made by check, money order or similar instrument) or directly to the Clearing Account (if payment is made by wire transfer) in accordance herewith.  Further, if at any time the Clearing Account and/or Clearing Account Bank shall change, Borrower shall, or shall cause Manager to, send out such replacement Tenant Instruction Notices or amendments or supplements thereto to Lender or Tenants, as applicable, as soon as is practicable and in any event within five (5) Business Days after the date of such change (with Lender's counter-signature or acknowledgement thereon).  If Borrower or any agent of Borrower shall at any time after the occurrence of a Cash Management Trigger Event receive from any Tenant or any other party any Rents or other charges related to the Property, Borrower shall immediately, and in any event within one (1) Business Day, remit or cause its agent to remit such receipts to Clearing Account Bank for deposit into the Clearing Account, or immediately, and in any event within one (1) Business Day, wire transfer such sums directly into the Clearing Account.

(ii) Borrower shall, or shall cause Manager to, within five (5) Business Days after the occurrence of a Cash Management Trigger Event deliver to each bank, issuer, processor or other entity ("**Credit Card Company**") with which Borrower has entered into merchant's or other agreement with respect to the processing of charge card, credit card, debit card or comparable forms of payment (a list of such Credit Card Companies as of the date hereof is attached hereto as Schedule VI), and shall upon its entry into each new agreement following the occurrence of a Cash Management Trigger Event deliver to the Credit Card Company thereunder, a notice in the form attached hereto as Exhibit B ("**Credit Card Instruction Notice**"). Without limitation to the foregoing, on the date hereof, Borrower has delivered to Lender executed Credit Instruction

Notices with respect to each Credit Card Company listed on <u>Schedule VI</u>, and, upon entering into each new agreement with a Credit Card Company, Borrower shall prior to the first occurrence of a Cash Management Trigger Event deliver to Lender an executed Credit Card Instruction Notice for to each Credit Card Company thereunder. Credit Card Instruction Notices delivered to Lender shall be held by Lender until the occurrence of a Cash Management Trigger Event. Borrower hereby ratifies and confirms that, from and after the occurrence of a Cash Management Trigger Event, all Rents payable with respect to the Property, in accordance with such merchant's agreements or otherwise, shall be transferred instead by wire transfer or the ACH System to Clearing Account Bank in accordance with this <u>Section 6.1.2</u>. If Borrower fails to provide any such Credit Card Instruction Notice (and without prejudice to Lender's rights with respect to such default), Lender shall have the right, and Borrower hereby grants to Lender a power of attorney (which power of attorney shall be coupled with an interest and irrevocable so long as any portion of the Debt remains outstanding), to sign, complete necessary account information and payment direction and deliver Credit Card Instruction Notices to each Credit Card Company thereunder if and to the extent Lender deems it necessary and without limitation to Borrower's obligation to provide Credit Card Instruction Notices as set forth above. Without the prior written consent of Lender, so long as any portion of the Debt remains outstanding, neither Borrower nor Manager shall terminate, amend, revoke or modify any Credit Card Instruction Notice in any manner whatsoever or direct or cause any Credit Card Company to pay any amount in any manner other than as provided in the related Credit Card Instruction Notice. Furthermore, Borrower shall, and shall cause Manager to, from after the occurrence of a Cash Management Trigger Event, instruct all Persons that maintain open accounts with Borrower with respect to the Property or with whom Borrower does business on an "accounts receivable" basis with respect to the Property to deliver all payments due under such accounts to the Clearing Account. If at any time the Clearing Account and/or Clearing Account Bank shall change, Borrower shall, or shall cause Manager to, send out such replacement Credit Card Instruction Notices or amendments or supplements thereto to Lender or Credit Card Companies, as applicable, as soon as is practicable and in any event within five (5) Business Days after the date of such change (with Lender's counter-signature or acknowledgement thereon). If Borrower or any agent of Borrower shall at any time after the occurrence of a Cash Management Trigger Event receive from any Credit Card Company or any other party any Rents or other charges payable or other charges related to the Property, Borrower shall immediately, and in any event within one (1) Business Day, remit or cause its agent to remit such receipts to Clearing Account Bank for deposit into the Clearing Account, or immediately, and in any event within one (1) Business Day, wire transfer such sums directly into the Clearing Account.

(b)     Borrower shall at all times cause there to be a Clearing Account Agreement in effect with Clearing Account Bank. So long as no Event of Default shall then exist at the time, Borrower shall have the right at any time to designate an Eligible Institution as successor Clearing Account Bank to hold the Clearing Account upon fifteen (15) days prior written notice to Lender and Clearing Account Bank and Lender's confirmation that accounts at such successor Clearing Account Bank satisfy the requirements of this <u>Section 6.1.2(b)</u> (and, if prior to Clearing Account Activation, the requirements of Section 6.1.2(a) above) and shall otherwise be reasonably acceptable to Lender. No such designation shall become effective until (i) Borrower has (1) delivered to Lender a written Clearing Account Agreement which has been duly executed and delivered to Lender by Borrower and the successor Clearing Account Bank and (2) prepared, executed, and filed such financing statements as Lender may reasonably deem

necessary or appropriate, and (ii) the successor Clearing Account Bank has been approved by Lender, which approval shall not be unreasonably withheld if Clearing Account Bank is an Eligible Institution. Upon receipt by Lender of the items complying with the requirements specified in the preceding sentence, Lender shall promptly deliver to the predecessor Clearing Account Bank (with a copy to Borrower) instructions to close the Clearing Account (if then open and activated) at the predecessor institution and to withdraw and transfer the funds on deposit therein directly to Lender for deposit into the new Clearing Account at the successor Clearing Account Bank.

(c)     If at any time Clearing Account Bank shall cease to be an Eligible Institution, Lender may instruct Borrower to appoint a successor Clearing Account Bank designated by Lender that is an Eligible Institution to hold the Clearing Account, whereupon Borrower shall, within thirty (30) days of such instruction, (i) deliver to Lender a Clearing Account Agreement which has been duly executed and delivered to Lender by Borrower and the successor Clearing Account Bank and (2) prepare, execute and file such financing statements as Lender may deem reasonably necessary or appropriate. Upon receipt by Lender of the items complying with the requirements specified in the preceding sentence, Lender shall promptly deliver to the predecessor Clearing Account Bank (with a copy to Borrower) instructions to close the Clearing Account (if then open and activated) at the predecessor institution and to withdraw and transfer the funds on deposit therein directly to Lender for deposit into the new Clearing Account at the successor Clearing Account Bank.

6.1.3   <u>Disbursements from the Clearing Account and Cash Management Account</u>. (a) Pursuant to the Clearing Account Agreement, on each Business Day, Clearing Account Bank shall be authorized to disburse all final and collected funds on deposit in the Clearing Account (the "**Available Funds**") as follows:  (i) prior to the provision by Lender of Cash Management Activation Notice, or if a Cash Management Activation Notice has been previously issued, after Clearing Account Bank's receipt of a Cash Management De-Activation Notice, all Available Funds shall be disbursed on each Business Day via ACH System, if available, or otherwise by wire transfer, to an account to be designated in writing by Borrower to Clearing Account Bank or as otherwise designated by Borrower to Clearing Account Bank from time to time; and (ii) upon receipt of a Cash Management Activation Notice and until receipt of a Cash Management De-Activation Notice, all Available Funds shall be disbursed via ACH System, if available, or otherwise by wire transfer, to an account under Lender's sole dominion and control to be designated in writing by Lender to Clearing Account Bank (the "**Cash Management Account**") at the Cash Management Bank (in each case without notifying, or obtaining the consent of, Borrower). Borrower agrees to cooperate with Lender and Cash Management Bank at any time during the term of this Agreement to execute any additional documents and take all additional actions which may be reasonably necessary or proper to establish the Cash Management Account.

(a)     Provided no Event of Default shall have occurred and is continuing, on each Payment Date, fund deposited in the Cash Management Account shall be applied in accordance with the terms of the Cash Management Agreement.

6.1.4   <u>Limitation of Liability</u>.  Borrower by executing this Agreement hereby consents to the use of the Clearing Account and Cash Management Account and the selection of Clearing

Account Bank and Cash Management Bank and any successors to Clearing Account Bank and/or Cash Management Bank appointed in accordance with the terms of this Agreement and the Cash Management Agreement. Lender shall not be liable for any claims, suits, actions, costs, damages, liabilities and expenses (collectively, the "**Account Liabilities**") in connection with the subject matter of this Agreement or the Cash Management Agreement or its obligations hereunder or thereunder, including, without limitation, any Account Liabilities arising out of the use of the lockbox, the Clearing Account or the Cash Management Account, the selection of Clearing Account Bank or Cash Management Bank, Clearing Account Bank's or Cash Management Bank's failure to comply with the terms and provisions of this Agreement or the Cash Management Agreement, the failure of the Clearing Account or Cash Management Account to produce a return on the investment of monies deposited therein or the loss of any monies as the result of the insolvency of Clearing Account Bank or Cash Management Bank, provided Lender shall be liable for Account Liabilities caused by Lender or Lender's agents gross negligence or willful misconduct.

6.1.5   Application After Event of Default.   Upon the occurrence and during the continuation of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any amounts then on deposit in the Clearing Account and/or the Cash Management Account to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.

6.1.6   Payments Received Under Cash Management Agreement.   The insufficiency of funds on deposit in the Clearing Account and/or Cash Management Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Agreement, the Note and the other Loan Documents, and such obligation shall be separate and independent, and not conditioned on any event or circumstance whatsoever. Notwithstanding anything to the contrary contained in this Agreement, the Note or the other Loan Documents, and provided that no Event of Default shall have occurred and remain outstanding, Borrower's obligations with respect to the payment of the Monthly Debt Service Payment Amount and amounts required to be deposited into the Reserve Funds, if any, shall be deemed satisfied to the extent sufficient amounts are deposited in the Cash Management Account to satisfy such obligations pursuant to the Cash Management Agreement on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

6.1.7   Security Interest; Perfection of Accounts.   Borrower hereby pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Clearing Account and the Cash Management Account as additional security for the performance of the Obligations. Further, Borrower hereby represents, warrants and covenants that:

(a)   This Agreement, together with the other Loan Documents, create a valid and continuing security interest (as defined in the Uniform Commercial Code) in the Clearing Account and the Cash Management Account in favor of Lender, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from Borrower. Other than in connection with the Loan Documents, Borrower has not sold, pledged, transferred or otherwise conveyed the Clearing Account and the Cash Management Account;

(b)    The Clearing Account and the Cash Management Account constitute "deposit accounts" or "securities accounts" within the meaning of the Uniform Commercial Code;

(c)    Pursuant and subject to the terms of this Agreement and the other Loan Documents, Clearing Account Bank and Cash Management Bank have agreed to comply with all instructions originated by Lender, without further consent by Borrower, directing disposition of the Clearing Account and the Cash Management Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities;

(d)    The Clearing Account and the Cash Management Account are not in the name of any Person other than Borrower, as pledgor, or Lender, as pledgee.  Borrower has not consented to Clearing Account Bank or Cash Management Bank complying with instructions with respect to the Clearing Account or the Cash Management Account from any Person other than Lender; and

(e)    Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

Section 6.2    Required Repair Funds.

6.2.1    Deposit of Required Repair Funds.  Borrower shall perform the repairs at the Property as more particularly set forth on Schedule IV hereto (such repairs, collectively, the "**Required Repairs**"), and shall complete each of the Required Repairs on or before the respective deadline as set forth on Schedule IV.  On the Closing Date, Borrower shall deposit with Lender an amount equal to the Required Repair Deposit.  Amounts deposited pursuant to this Section 6.2.1 are referred to herein as the "**Required Repair Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Required Repair Account**."

6.2.2    Release of Required Repair Funds.  Lender shall disburse to Borrower the Required Repair Funds to pay or reimburse Borrower for the cost of Required Repairs upon delivery to Lender of a request for disbursement in form specified or approved by Lender and accompanied by a certification from Borrower and evidence reasonably satisfactory to Lender of the incurrence of the related expenditure and, if applicable, completion of any related work lien free, in a good workmanlike manner and in accordance with all applicable Legal Requirements, and the satisfaction of such other conditions as Lender may reasonably require. Lender shall not be required to disburse Required Repair Funds more frequently than once each calendar month, and each disbursement must be in amounts not less than the Minimum Disbursement Amount (or a lesser amount if the total remaining balance of the Required Repair Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount of the remaining balance of the Required Repair Funds shall be made). Any Required Repair Funds remaining after the Debt has been paid in full shall be promptly returned to Borrower.

Section 6.3    Tax and Insurance Escrow Fund.

6.3.1    Deposits.  On the Closing Date, Borrower shall deposit with Lender an amount equal to the Initial Tax Deposit and, on each Payment Date, Borrower shall deposit with Lender an amount equal to one-twelfth (1/12) of the Taxes (the "**Monthly Tax Deposit**") that Lender from time to time estimates will be payable during the next ensuing twelve (12) months in order to accumulate sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates.  Amounts deposited pursuant to this Section 6.3.1 are referred to herein as the "**Tax Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Tax Account**."  If at any time Lender reasonably determines that the Tax Funds will not be sufficient to pay the Taxes at least thirty (30) days prior to the respective due dates, Lender shall notify Borrower of such determination and the monthly deposits for Taxes shall be increased by the amount that Lender reasonably estimates is sufficient to make up the deficiency at least twenty (20) days prior to the respective due dates for the Taxes; provided that if Borrower receives notice of any such deficiency after the date that is twenty (20) days prior to the date that Taxes are due, Borrower will deposit such amount within one (1) Business Day after its receipt of such notice.

6.3.2    Release of Tax Funds.  Lender will apply the Tax Funds to payments of Taxes required to be made by Borrower pursuant to Section 4.1.2 and under the Security Instrument. Borrower shall furnish Lender with all bills, statements and estimates for Taxes at least thirty (30) days prior to the date on which such Taxes first become payable.  In making any payment relating to Taxes, Lender may do so according to any bill, statement or estimate procured from the public office (with respect to Taxes) without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If the amount of the Tax Funds shall exceed the amounts due for Taxes, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax Funds.  Any Tax Funds remaining after the Debt has been paid in full shall be returned to Borrower.

Section 6.4    Insurance Funds.

6.4.1    Deposits of Insurance Funds.  On the Closing Date, Borrower shall deposit with Lender an amount equal to the Initial Insurance Deposit and, on each Payment Date, Borrower shall deposit with Lender an amount equal to one-twelfth (1/12) of the Insurance Premiums (the "**Monthly Insurance Deposit**") that Lender reasonably estimates will be payable for the renewal of the coverages afforded by the Policies upon the expiration thereof in order to accumulate sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies.  Amounts deposited pursuant to this Section 6.4.1 are referred to herein as the "**Insurance Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Insurance Account**."  If at any time Lender reasonably determines that the Insurance Funds will not be sufficient to pay the Insurance Premiums at least thirty (30) days prior to the expiration of the Policies, Lender shall notify Borrower of such determination and the monthly deposits for Insurance Premiums shall be increased by the amount that Lender reasonably estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Policies; provided that if Borrower receives notice of any

such deficiency after the date that is thirty (30) days prior to expiration of the Policies, Borrower will deposit such amount within one (1) Business Day after its receipt of such notice.

6.4.2   <u>Release of Insurance Funds</u>.  Lender will apply the Insurance Funds to payments of Insurance Premiums for the Policies required to be maintained by Borrower pursuant to <u>Section 5.1</u> hereof.  Borrower shall furnish Lender with all bills, invoices and statements for Insurance Premiums at least twenty (20) days prior to the date on which such Insurance Premiums first become payable.  In making any payment relating to Insurance Premiums, Lender may do so according to any bill, invoice or statement procured from the insurance company or its agent, without inquiry into the accuracy of such bill, invoice or statement.  If the amount of the Insurance Funds shall exceed the amounts due for Insurance Premiums, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Insurance Funds.  Any Insurance Funds remaining after the Debt has been paid in full shall be returned to Borrower.

Section 6.5   <u>Capital Expenditure Funds</u>.

6.5.1   <u>Deposits of Capital Expenditure Funds</u>.  On the Closing Date, Borrower shall deposit with Lender an amount equal to the Initial Capital Expenditure Deposit and, on each Payment Date, Borrower shall deposit with Lender an amount equal to the Monthly Capital Expenditure Deposit for annual Capital Expenditures approved by Lender, which approval shall not be unreasonably withheld or delayed ("**Approved Capital Expenditures**").  Amounts deposited pursuant to this <u>Section 6.5.1</u> are referred to herein as the "**Capital Expenditure Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Capital Expenditure Account**."  Lender may reassess its estimate of the amount necessary for Capital Expenditures from time to time and may require Borrower to increase the monthly deposits required pursuant to this <u>Section 6.5.1</u> upon thirty (30) days' written notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary for proper maintenance and operation of the Property.

6.5.2   <u>Release of Capital Expenditure Funds</u>.  Lender shall disburse to Borrower the Capital Expenditure Funds to pay or reimburse Borrower for Approved Capital Expenditures upon delivery to Lender of a request for disbursement in form specified or approved by Lender and accompanied by a certification from Borrower and evidence reasonably satisfactory to Lender of the incurrence of the related expenditure and, if applicable, completion of any related work lien free, in a good workmanlike manner and in accordance with all applicable Legal Requirements, and the satisfaction of such other conditions as Lender may reasonably require.  Lender shall not be required to disburse Capital Expenditure Funds more frequently than once each calendar month, and each disbursement must be in amounts not less than the Minimum Disbursement Amount (or a lesser amount if the total remaining balance of the Capital Expenditure Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount of the remaining balance of the Capital Expenditure Funds shall be made). Any Capital Expenditure Funds remaining after the Debt has been paid in full shall be promptly released to Borrower.

Section 6.6   <u>Intentionally Omitted</u>.

Section 6.7    Intentionally Omitted.

Section 6.8    Intentionally Omitted.

Section 6.9    Excess Cash Flow Funds.

6.9.1   Deposits of Excess Cash Flow Funds.   During a Cash Sweep Event Period, except during any period that Borrower is required to deposit Excess Cash Flow pursuant to Section 6.11.1 below, Borrower shall deposit with Lender Excess Cash Flow, which sums shall be held by Lender as additional security for the Loan.  Amounts so deposited shall hereinafter be referred to as the "Excess Cash Flow Funds" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "Excess Cash Flow Account."

6.9.2   Release of Excess Cash Flow Funds.   Upon the termination of a Cash Sweep Event Period and provided that no other Cash Sweep Event shall have occurred and remain outstanding, all funds on deposit in the Excess Cash Flow Account shall be deposited into the Cash Management Account and applied in accordance with this Agreement and the Cash Management Agreement.

Section 6.10    Intentionally Omitted.

Section 6.11    PIP Reserve Funds.

6.11.1 Deposits of PIP Reserve Funds.   On the Closing Date, Borrower shall deposit with Lender an amount equal to the Initial PIP Reserve Deposit and, on each Payment Date during the occurrence of a Franchise Trigger Event, Borrower shall deposit with Lender all Excess Cash Flow to pay or reimburse Borrower for the costs and expenses of any work set forth in any PIP approved by Lender (the "**PIP Work**").  Amounts deposited pursuant to this Section 6.11.1 are referred to herein as the "**PIP Reserve Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**PIP Reserve Account.**"

6.11.2 Release of PIP Reserve Funds.   Lender shall disburse to Borrower the PIP Reserve Funds to pay or reimburse Borrower for approved costs and expenses of completing the PIP Work provided that:

(a)    Borrower shall deliver to Lender a request for disbursement in form specified or approved by Lender;

(b)    Borrower shall deliver to Lender invoices evidencing that the costs for which such disbursements are requested are due and payable;

(c)    Borrower shall deliver to Lender an Officer's Certificate and evidence reasonably satisfactory to Lender confirming that (i) all such costs have been previously paid by Borrower or will be paid from the proceeds of the requested disbursement, (ii) all conditions precedent to such disbursement required by the Loan Documents have been satisfied, (iii) the related work has been completed lien free, in a good workmanlike manner and in accordance with all applicable Legal Requirements, and (iv) the amount remaining in the PIP

Reserve Account, after giving effect to the requested disbursement, shall be sufficient to complete the PIP Work; and

(d)     Lender may condition the making of a requested disbursement on (i) reasonable evidence establishing that Borrower has applied any amounts previously received by it in accordance with this Section for the expenses to which specific draws made hereunder relate, (ii) a reasonably satisfactory site inspection, (iii) receipt of lien releases and waivers from any contractors, subcontractors and others with respect to such amounts, and (iv) if such disbursement is the final disbursement, confirmation from the Franchisor that the PIP has been completed and accepted by Franchisor; and

(e)     the satisfaction of such other conditions as Lender may reasonably require.

Lender shall not be required to disburse PIP Reserve Funds more frequently than once each calendar month, and each disbursement must be in amounts not less than the Minimum Disbursement Amount (or a lesser amount if the total remaining balance of the PIP Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount of the remaining balance of the PIP Reserve Funds shall be made). Any PIP Reserve Funds remaining after the Debt has been paid in full shall be promptly released to Borrower.

Section 6.12   Reserve Funds, Generally.

6.12.1 Security Interest.   Borrower hereby pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Reserve Funds as additional security for the performance of the Obligations. Until expended or applied as provided in this Agreement, the Reserve Funds shall constitute additional security for the performance of the Obligations. Lender shall have no obligation to release any of the Reserve Funds while any Event of Default has occurred and remains outstanding. Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon the occurrence of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in the Reserve Funds to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion. Borrower shall not further pledge, assign or grant any security interest in any Reserve Fund or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

6.12.2 Investments; Income Taxes.   The Reserve Funds shall be held in Lender's name and may be commingled with Lender's own funds at financial institutions selected by Lender in its sole discretion. The Reserve Funds may be invested in Permitted Investments as directed by Lender. Lender shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds. In connection with the liquidation and transfer of any amounts then invested in Permitted Investments to the applicable Reserve Funds or reinvestment of such amounts in other Permitted Investments as Lender may reasonably determine to be necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce Lender's rights and remedies hereunder with respect to any Reserve Funds, Borrower shall deposit with Lender an amount equal to the actual losses sustained on such liquidation within one (1) Business Day of Lender's notice. All interest on a

Reserve Fund (other than the Tax Fund and the Insurance Fund, which shall not be added to or become a part thereof and shall be the sole property of and shall be paid to Lender) shall be added to ad become a part thereof. Borrower shall report on its federal, state and local income tax returns all interest or income on the Reserve Funds credited or paid to Borrower.

6.12.3 <u>Costs</u>. All reasonable, out-of-pocket costs and expenses incurred by Lender in connection with holding and disbursing the Reserve Funds (including, without limitation, the costs and expenses of the inspections, if any, required hereunder) shall be paid by Borrower.

## VII.   **DEFAULTS**

Section 7.1    <u>Event of Default</u>. Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"): (i) if any portion of the Debt is not paid on or before the date the same is due and payable or if the entire Debt is not paid on or before the Maturity Date; (ii) if any of the Taxes or Other Charges is not paid prior to the date the same becomes delinquent except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Agreement; (iii) if the Policies are not kept in full force and effect (unless due to Lender's failure to apply the Insurance Funds to payment of Insurance Premiums as required in <u>Section 6.4.2</u>), or if the Policies are not delivered to Lender upon request or Borrower has not delivered evidence of the renewal of the Policies thirty (30) days prior to their expiration as provided in this Agreement; (iv) if any breach of any provision of <u>Section 3.1.15</u>, <u>Section 4.1.12</u> or <u>Section 8.5</u> shall occur; (v) if any representation or warranty made by Borrower or any Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made; (vi) if (A) Borrower, any SPC Party or any Guarantor shall commence any case, proceeding or other action (1) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, adjustment, liquidation, dissolution or other relief with respect to it or its debts, or (2) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or Borrower, any SPC Party or any Guarantor shall make a general assignment for the benefit of its creditors; or (B) there shall be commenced against Borrower, any SPC Party or any Guarantor any case, proceeding or other action of a nature referred to in clause (A) above which (1) results in the entry of an order for relief or any such adjudication or appointment or (2) remains undismissed or undischarged for a period of ninety (90) days; (C) there shall be commenced against Borrower, any SPC Party or any Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; (D) Borrower, any SPC Party or any Guarantor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, in each case in writing, any of the acts set forth in clause (A), (B), or (C) above; or (E) if Borrower, any SPC Party or any Guarantor fails or admits its inability to pay debts generally as they become due (provided that, with respect to any Guarantor, the events or occurrences set forth in this clause shall constitute an Event of Default only if Lender elects to declare the same as an Event of Default in Lender's sole and absolute discretion); (vii)

if Borrower shall be in default beyond any applicable notice or cure period under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument; (viii) if the Property becomes subject to any Lien other than a lien for local real estate taxes and assessments not then delinquent and such Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days after Borrower has first received notice thereof (except where such Lien is being contested by Borrower in accordance with Section 4.1.2 hereof); (ix) if within three (3) days of Lender's demand therefor Borrower fails to comply with any of its obligations under Section 8.1, Section 8.2 and/or Section 8.4, (x) with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement and/or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice and/or the expiration of such grace period; (xi) intentionally omitted; (xii) intentionally omitted; (xiii) if a material default has occurred and continues beyond any applicable cure period under the Franchise Agreement and such default permits Franchisor to terminate or cancel the Franchise Agreement; (xiv) if Borrower ceases to do business as a hotel at the Property or terminates such business for any reason whatsoever (other than temporary cessation in connection with any continuous and diligent renovation or restoration of the Property following a Casualty or Condemnation); (xv) if any default beyond any applicable notice or cure period occurs under any guaranty or indemnity executed in connection with the Loan and such default continues after the expiration of applicable grace periods, if any; or (xvi) if Borrower shall continue to be in default under any other term, covenant or condition of this Agreement, the Note, the Security Instrument or the other Loan Documents not specified above for more than (y) ten (10) days after written notice from Lender, in the case of any default which can be cured by the payment of a sum of money, or (z) thirty (30) days after written notice from Lender ,in the case of any other default, provided that, in the case of any default referred to in clause (z), if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of sixty (60) days.

Section 7.2    Remedies.  Upon the occurrence of an Event of Default and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and or any part of the Property, including, without limitation, all rights or remedies available at law or in equity. Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Property.  Any such actions taken by Lender shall be cumulative

and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by Legal Requirement, without impairing or otherwise affecting the other rights and remedies of Lender permitted by Legal Requirement, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

Section 7.3    Remedies Cumulative; Waivers.    The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one or more Events of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## VIII.  **SPECIAL PROVISIONS**

Section 8.1    Sale of Mortgage and Securitization.  (a)  Lender shall have the right (i) to sell or otherwise transfer the Loan as a whole loan or sell or otherwise transfer any portion thereof or any interest therein, (ii) to sell participation interests in the Loan or (iii) to securitize the Loan or any portion thereof or any interest therein in one or more private or public securitizations.  (The transactions referred to in clauses (i), (ii) and (iii) are each hereinafter referred to as a "**Secondary Market Transaction**" and the transaction referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**."  Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**.")

(b)    Lender may forward to each actual or prospective purchaser, transferee, assignee, servicer, participant, investor in such Securities or any Rating Agency rating such Securities (each, an "**Investor**"), all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor and the Property, whether furnished by Borrower, any Guarantor or otherwise, as Lender determines necessary or desirable. If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be required in the marketplace, by the Rating Agencies, Investors or prospective Investors or by any Legal Requirements in connection with any Secondary Market Transactions.  Borrower shall cooperate, and shall cause each Guarantor to cooperate, with Lender in connection with any Secondary Market Transactions. Borrower shall also promptly furnish and shall cause each Guarantor to consent to Lender furnishing to any actual or prospective Investors and Rating Agency any and all available information concerning the Property, the Leases, the financial condition of Borrower or any Guarantor as may be

requested by Lender, any Investor, prospective Investor, Rating Agency or prospective Rating Agency (including, but not limited to, copies of information previously supplied to Lender) in connection with any Secondary Market Transaction.

Section 8.2    Securitization Indemnification.  Borrower understands that all information provided to Lender by Borrower, its Affiliates or their respective agents, counsel and representatives, including information provided (y) in connection with a Secondary Market Transaction or the underwriting or closing of the Loan or (z) at any time after the date hereof (including financial statements of Borrower, operating statements and rent rolls with respect to the Property) ("**Provided Information**") may be included in written materials (including a prospectus, private placement memorandum or other marketing or offering documentation) ("**Disclosure Documents**") used or provided to Investors or Rating Agencies in connection with a Secondary Market Transaction and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), and may be made available to Investors, Rating Agencies and other advisory and service providers relating to Secondary Market Transactions. Borrower hereby agrees to indemnify Lender, Rialto Mortgage Finance, LLC ("**RIALTO**"), any Affiliate of Lender or RIALTO that has filed any registration statement relating to a Securitization or has acted as the issuer, sponsor, depositor or seller in connection with a Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of Securities issued in connection with a Securitization, any other issuers, depositors, underwriters, placement agents or initial purchasers of Securities issued in connection with a Securitization, and each of their respective officers, directors, partners, employees, representatives, agents and Affiliates, and each Person that controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**Securitization Indemnified Parties**") for any Losses (collectively, the "**Securitization Indemnification Liabilities**") to which any Securitization Indemnified Party may become subject insofar as the Securitization Indemnification Liabilities arise out of or are based upon (i) any untrue statement or alleged untrue statement of any material fact contained in any Provided Information or the omission or alleged omission to state in any Provided Information a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, (ii) a breach of the representations and warranties made by Borrower in Sections 3.1.20 hereof, (iii) any untrue statement or alleged untrue statement of a material fact in any Disclosure Document, or any omission or alleged omission to state a material fact required to be stated in any Disclosure Document or necessary in order to make the statements in any Disclosure Document, in light of the circumstances under which they were made, not misleading, (iv) any Exchange Act Filings and information therein or other reports containing comparable information that are required to be made "available" to holders of the Securities under applicable Legal Requirements, as it relates to the Property, Borrower, Guarantor, Manager or any Affiliate of Borrower, Guarantor, Manager or any other aspect of the Loan or (v) any indemnification made by any Securitization Indemnified Party to the Rating Agencies in connection with issuing, monitoring or maintaining the securities issued in connection with any securitization of the Loan (in the case of clauses (iii)-(v), to the extent such Losses arise out of or are based upon an untrue statement or omission made therein in reliance upon and in conformity with Provided Information).  To the extent that any undertaking to indemnify, defend and hold harmless set forth in this Section 8.2 may be unenforceable because it violates any law or public policy,

Borrower shall pay or contribute the maximum portion that it is permitted to pay or contribute and satisfy under applicable law to the payment and satisfaction of all Securitization Indemnification Liabilities incurred by the Securitization Indemnified Parties. Borrower agrees that the obligations set forth in this <u>Section 8.2</u> shall apply whether or not any Securitization Indemnified Party is a formal party to any claim, action, suit or proceeding. Borrower further agrees that the Securitization Indemnified Parties are intended third party beneficiaries under this <u>Section 8.2</u>. The liabilities and obligations of Borrower and the Securitization Indemnified Parties under this <u>Section 8.2</u> shall survive the satisfaction and discharge of the Debt.

Section 8.3     <u>Servicer</u>.  At the option of Lender, the Loan may be serviced by a servicer, master servicer, primary servicer, special servicer and/or trustee (any such servicer, master servicer, primary servicer, special servicer and trustee, together with its agents, nominees or designees, are collectively referred to herein as "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement and/or other agreement providing for the servicing of one (1) or more mortgage loans (collectively, the "**Servicing Agreement**") between Lender and Servicer. Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and Guarantor pursuant to the provisions of this Agreement and the other Loan Documents. Borrower shall be responsible for (i) any reasonable set-up fees or any other initial costs and expenses relating to or arising under the Servicing Agreement and (ii) any fees and expenses of Servicer (including, without limitation, attorneys' fees and disbursements) in connection with any release of the Property, any prepayment, defeasance, assumption, amendment or modification of the Loan, any documents or matters requested by Borrower, special servicing or work-out of the Loan or enforcement of the Loan Documents. Without limiting the generality of the foregoing, Servicer shall be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto under this Agreement and the other Loan Documents.

Section 8.4     <u>Mezzanine Loan; Components</u>.  Lender shall have the right, at any time to modify the Loan in order to (i) create one or more senior, pari-passu and/or subordinate notes (each a "**Replacement Note**"), create one or more components of the Note or any Replacement Note or reduce the number of components of the Note or any Replacement Note, or (ii) create one or more mezzanine loans (each, a "**Mezzanine Loan**") made to a newly formed single purpose, bankruptcy remote entity acceptable to Lender (each, a "**Mezzanine Borrower**") that will own one hundred percent (100%) of the direct or indirect ownership interests in Borrower (as designated by Lender) to be secured by a first priority perfected security interest on all such interests, and, in the case of both (i) and (ii), revise the interest rate, reallocate the principal balances of the Note, any Replacement Note or any component (or, in the case of any Mezzanine Loan, of the Loan and any Mezzanine Loan(s)), increase or decrease the monthly debt service payments for the Note, any Replacement Note or any component (or, in the case of any Mezzanine Loan, for the Loan and any Mezzanine Loan(s)) or eliminate all or any part of the component structure, the multiple note structure or the Mezzanine Loan structure (including the elimination of the related allocations of principal and interest payments), provided that, in each of the foregoing instances, (1) the outstanding principal balance of the Note and all Replacement Notes (or, in the case of any Mezzanine Loan, of the Loan and all Mezzanine Loans) immediately after the effective date of such modification equals the outstanding principal

balance of the Note and all Replacement Notes (or, in the case of any Mezzanine Loan, of the Loan and all Mezzanine Loans) immediately prior to such modification and (2) the weighted average of the interest rates for the Note and all Replacement Notes, including all components thereof (or, in the case of any Mezzanine Loan, for the Loan and all Mezzanine Loans) immediately after the effective date of such modification equals the weighted interest rate of the Note and all Replacement Notes, including all components thereof (or, in the case of any Mezzanine Loan, for the Loan and all Mezzanine Loans) immediately prior to such modification. At Lender's election, the Note, any Replacement Note, any Mezzanine Loan or any component of any of the foregoing may be subject to one or more Secondary Market Transactions. Lender shall have the right to modify the Note, any Replacement Note, any Mezzanine Loan or any components thereof in accordance with this Section 8.4 and, provided that such modification shall comply with the terms of this Section 8.4 it shall become immediately effective. Borrower shall promptly execute (and cause each Mezzanine Borrower to execute) such documents and instruments, cause its counsel to deliver such opinion letters, execute such amendments to the Loan Documents and any Mezzanine Loan documents, and deliver such amendments or updates to the title insurance policy insuring the lien of this Agreement as Lender may request to effectuate the purpose of this Section 8.4. All costs and expenses incurred by Borrower in connection with this Section 8.4 shall be paid by Borrower.

Section 8.5    Single Purpose Entity.  Until the Debt has been paid in full, Borrower hereby represents, warrants and covenants that since its formation it has always been and shall continue to be a Single Purpose Entity.

Section 8.6    Exculpation.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note or the Security Instrument by any action or proceeding wherein a money judgment shall be sought against Borrower or any Affiliate of Borrower or any officers, directors, shareholders, manager, members, trustees, employee or agents of Borrower or its Affiliates other than the Guarantor pursuant to the Guaranty and the Environmental Indemnity (collectively, "**Exculpated Parties**"), except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender created by this Agreement, the Note, the Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender. Lender, by accepting this Agreement, the Note and the Security Instrument, agrees that it shall not, except as otherwise expressly provided in the Loan Documents, sue for, seek or demand any deficiency judgment against Borrower or any Exculpated Party in any such action or proceeding, under or by reason of or under or in connection with this Agreement, the Note, the other Loan Documents or the Security Instrument. The provisions of this Section 8.6 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the other Loan Documents or the Security Instrument; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument; (c) affect the validity or enforceability of any indemnity (including, without limitation, the Environmental Indemnity), guaranty (including without limitation, the Guaranty), master lease or similar instrument made in connection with

this Agreement, the Note, the Security Instrument, or the other Loan Documents; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; (f) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower if necessary to obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under the Security Instrument; provided however, Lender shall only enforce such judgment to the extent of the Insurance Proceeds and/or Awards, or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any Losses arising out of or in connection with the following:

        (i)    fraud, intentional or material misrepresentation by Borrower, Guarantor or any of their respective Affiliates, agents or representatives in connection with the Loan;

        (ii)    the gross negligence or willful misconduct by or on behalf of Borrower, Guarantor or any of their respective Affiliates, agents or representatives in connection with the Loan;

        (iii)    the removal or disposal of any portion of the Property during the continuance of an Event of Default, unless any personal property that is removed or disposed of is replaced with personal property of the same utility and the same or greater value;

        (iv)    the misappropriation, misapplication or conversion by Borrower of (A) any Insurance Proceeds paid by reason of any Casualty, (B) any Awards or other amounts received in connection with a Condemnation of all or a portion of the Property, or (C) any Rents collected and not applied in accordance with the Loan Documents;

        (v)    the failure to deliver to Lender upon a foreclosure of the Security Instrument any security deposits, advance deposits or any other deposits collected with respect to the Property, except to the extent any such security deposits were applied in accordance with the terms and conditions of the applicable Leases prior to such foreclosure or action in lieu thereof;

        (vi)    Borrower's failure to obtain and maintain in full force and effect fully paid for Policies as required by this Agreement or to pay any Taxes or assessments affecting the Property, provided that Borrower will not be liable under this clause (vi) to the extent that (x) the Property does not generate sufficient cash flow to pay such sums during the applicable period or (y) sufficient funds have been deposited in the applicable Reserve Fund, Lender's access to such funds is not restricted by court order or any actions of Borrower or Guarantor, Lender is obligated to apply or make available such funds for such purposes and Lender does not apply or make available such funds for the payment of Taxes or assessments or premiums for Policies, as applicable;

        (vii)    failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property, provided that Borrower will

not be liable under this clause (vii) to the extent that the Property does not generate sufficient cash flow to pay such sums unless such charges were incurred in violation of the Loan Documents;

(viii)   Borrower's breach of any of its obligations set forth in Section 8.2 hereof;

(ix)   the occurrence of any material physical waste at the Property;

(x)   Borrower's or Guarantor's commission of a criminal act which results in seizure or forfeiture of the Property or any portion thereof;

(xi)   the breach of <u>Section 8.5</u> in any material respect;

(xii)   Borrower's failure to permit on-site inspections of the Property or to provide financial information or to appoint a new property manager upon written request of Lender, in each case as required by, and in accordance with the terms and provisions of, this Agreement and the other Loan Documents;

(xiii)   any litigation or other legal proceeding related to the Debt filed by, or any other act or omission by, any Restricted Party that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein or in any other Loan Document or to realize on any collateral for the Loan, including, without limitation, the assertion by any Restricted Party of any defenses (other than defenses raised in good faith) or counterclaims against Lender; or

(xiv)   if (i) the Franchise Agreement is amended, modified or terminated without Lender's prior written consent other than as expressly permitted by this Agreement, (ii) Borrower fails to pay for and complete any and all work required under any PIP pursuant to the Franchise Agreement or any replacement franchise agreement during the term of the Loan or (iii) Borrower breaches any of its obligations set forth in Section 4.1.9 hereof.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the other Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b) or 1111(b) or any other provisions of the U.S. Bankruptcy Code or any other Bankruptcy Law to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that any of the following occur:

(1)   Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of, this Agreement and the other Loan Documents, and such failure is a factor in the consolidation of the assets and liabilities of Borrower and any other Person;

(2) Borrower fails to obtain Lender's prior consent to any Indebtedness except to the extent expressly permitted by this Agreement;

(3) Borrower fails to obtain Lender's prior consent to any Transfer except to the extent expressly permitted by this Agreement;

(4) Borrower files a voluntary petition under the Bankruptcy Law;

(5) Guarantor or an Affiliate, officer, director, or representative which controls, directly or indirectly, Borrower files, or joins, in each case in writing, in the filing of, an involuntary petition against Borrower under the Bankruptcy Law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person;

(6) Borrower files, without the prior written consent of Lender, an answer consenting to or otherwise acquiescing in or joining in, in each case in writing, any involuntary petition filed against it by any other Person under the Bankruptcy Law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person but expressly permitting Borrower to appear in any proceeding relating to the foregoing to assert defenses to, and to dismiss or stay, such action within the time periods provided under the Loan Documents;

(7) Guarantor or any Affiliate, officer, director, or representative which controls, directly or indirectly, Borrower consents to or acquiesces in or joins in, in each case in writing, an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property;

(8) Borrower makes an assignment for the benefit of creditors, or admits, in writing (except to Lender or its successors or assigns) or in any action or proceeding, its insolvency or inability to pay its debts as they become due; or

(9) Any expiration or termination of the Franchise Agreement for any reason until such time as a replacement franchise agreement acceptable to Lender has been entered into with a franchisor acceptable to Lender, all related PIP Work has been completed and paid for and Lender has received an executed comfort letter from such replacement franchisor acceptable to Lender.

## IX.   MISCELLANEOUS

Section 9.1   <u>Survival</u>.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 9.2    Lender's Discretion.   Whenever pursuant to this Agreement Lender exercises any right given to it to approve or disapprove any matter, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove such matter or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive.   Prior to a Securitization, whenever pursuant to this Agreement the Rating Agencies are given any right to approve or disapprove any matter, or any arrangement or term is to be satisfactory to the Rating Agencies, the decision of Lender to approve or disapprove such matter, or to decide whether arrangements or terms are satisfactory or not satisfactory, shall be substituted therefor, which such decision shall be based upon Lender's determination of Rating Agency criteria (unless Lender has an independent approval right in respect of the matter at issue pursuant to the terms of this Agreement, in which case the discretion afforded to Lender in connection with such independent approval right shall apply instead).

Section 9.3    Governing Law.   (a) THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.

(a)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

Section 9.4    Modification, Waiver in Writing.   No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.   Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 9.5    Delay Not a Waiver.   Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise,

or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 9.6    Notices.  All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof and confirmed by telephone by sender, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | Kornbluth Texas, LLC<br>302 W. Bay Area Blvd.<br>Webster, Texas 77598<br>Attention: Cheryl Tyler<br>Facsimile No.: (281) 335-6723 |
| with a copy to: | Garvey Schubert Barer<br>121 SW Morrison, 11th Floor<br>Portland, Oregon 97204-3141<br>Attention: Joseph W. West, Esq.<br>Facsimile No.: (503) 226-0259 |
| If to Lender: | Rialto Mortgage Finance, LLC<br>600 Madison Avenue, 12th Floor<br>New York, New York 10022<br>Attention: Kenneth M. Gorsuch, Managing Director<br>Facsimile No.: (212) 415-4841 |
| with a copy to: | Rialto Capital<br>730 NW 107 Avenue, Suite 400<br>Miami, Florida 33172<br>Attention: Liat Heller, General Counsel<br>Facsimile No.: (305) 229-6425 |
| and | Sills Cummis & Gross, P.C.<br>1 Riverfront Plaza<br>Newark, NJ  07102<br>Attention:  Robert Hempstead, Esq.<br>Facsimile No: (973) 643-7000 |

or addressed as such party may from time to time designate by written notice to the other parties. Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

Section 9.7    Trial by Jury.   BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

Section 9.8    Headings.   The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 9.9    Severability.   Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under Legal Requirement, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 9.10    Preferences.   Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, State or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 9.11    Waiver of Notice.   Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 9.12    Remedies of Borrower. In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 9.13    Expenses; Indemnity. (a) Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in the Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (ii) Lender's ongoing performance of and compliance with all agreements and covenants contained in the Loan Documents on its part to be performed or complied with after the Closing Date; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to the Loan Documents and any other documents or matters requested by Borrower or any Guarantor; (iv) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Lender pursuant to the Loan Documents; (v) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property or any other security given for the Loan; and (vi) enforcing any Obligations of or collecting any payments due from Borrower or Guarantor under the Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any Bankruptcy Action; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender, as determined by a final non-appealable judgment of a court of competent jurisdiction. Any costs due and payable to Lender may be paid, at Lender's election in its sole discretion, from any amounts in the Cash Management Account.

(b)    Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all Losses that may be imposed on, incurred by, or asserted against any Indemnified Party in any manner relating to or arising out of (i) any default or breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, the Loan Documents, (ii) the use or intended use of the proceeds of the Loan, (iii) any materials or information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument, the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about .the Property or on adjoining sidewalks, curbs, adjacent property or

adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) any failure of the Property to comply with any Legal Requirement; (ix) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against such Indemnified Party with respect thereto; (x) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; and (xi) any indemnification to the Rating Agencies in connection with issuing, monitoring or maintaining the Securities insofar as such Losses arise out of any untrue statement of any material fact in any materials or information provided by or on behalf of Borrower or arise out of the omission to state a material fact in such materials or information required to be stated therein or necessary in order to make the statements in such materials or information, in light of the circumstances under which they were made, not misleading (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Indemnified Parties hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Indemnified Parties, as determined by a final non-appealable judgment of a court of competent jurisdiction. Borrower hereby fully and unconditionally releases each of the Indemnified Parties from and against any and all Losses that may be or may have previously been imposed on, incurred by, or asserted against any Indemnified Party by Borrower or any affiliate of Borrower in any manner relating to or arising out of the origination, underwriting or processing of the Loan by Lender.The provisions of Section 9.13(a), this Section 9.13(b), Section 9.13(c) and Section 9.13(d) shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument.

(c)     Borrower shall, at its sole cost and expense, indemnify, defend and hold harmless Indemnified Parties from and against any and all Losses imposed on, incurred by, or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents, but excluding any income, franchise or other similar taxes.

(d)     Borrower shall, at its sole cost and expense, indemnify, defend and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Section 3.1.15.

(e)     Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding. Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and

disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

(f)     Borrower hereby agrees to pay for or, if Borrower's fails to pay, to reimburse Lender for, any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of the Loan Documents, and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to obtaining any such consent, approval, waiver or confirmation.

Section 9.14   Schedules and Exhibits Incorporated.   The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 9.15   Offsets, Counterclaims and Defenses.   Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 9.16   No Joint Venture or Partnership; No Third Party Beneficiaries.   Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.   Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender. This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

Section 9.17   Publicity.   All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, RIALTO, or any of their Affiliates shall be subject to the prior written approval of Lender, which shall not be unreasonably withheld.   Notwithstanding the foregoing, disclosure required by any federal or State securities laws, rules or regulations, as determined by Borrower's counsel, shall not be subject to the prior written approval of Lender.

Section 9.18   Waiver of Marshalling of Assets.   To the fullest extent permitted by applicable Legal Requirements, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of all or part of the Security Instrument, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

Section 9.19   Waiver of Counterclaim.   Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 9.20   Conflict; Construction of Documents; Reliance.   In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.   The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.   Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.   Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.   Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 9.21   Brokers and Financial Advisors.   Borrower agrees to pay and to indemnify and hold Lender harmless from any all loss, cost or expense (including attorneys' fees and expenses) arising from the claims of any brokers or anyone claiming a right to any fees in connection with the financing of the Property (each, a "Broker").   It is possible that a Broker or its affiliate shall receive consideration from Lender in connection with the Loan (including incentive fees based on loan origination volume, additional brokerage fees or servicing rights or fees) and that such consideration may be based on the profitability of the Loan to Lender. Borrower acknowledges and agrees that it has made and will make such inquiries of each Broker, if any, as it deems necessary with respect to the nature or existence of any such arrangement. No agreement by Lender to pay any such fees or compensation to such Broker (if any) shall be binding upon Lender unless it is set forth in separate written instrument that has been duly executed by Lender and such Broker.

Section 9.22  Joint and Several Liability.  If Borrower consists of more than one (1) Person, the representations, warranties, covenants, obligations and liabilities of each Person shall be joint and several.

Section 9.23  Limitation on Liability.  Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of Lender's interest in the Property only.  No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, any other asset or property of Lender or the asset or property of any of Lender's shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

Section 9.24  Prior Agreements.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and/or its Affiliates and Lender are superseded by the terms of this Agreement and the other Loan Documents.

**THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES HERETO.**

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**KORNBLUTH TEXAS, LLC,** a Texas limited liability company

By:_____

Name: Cheryl Tyler

Title:  Manager

LENDER:

**RIALTO MORTGAGE FINANCE, LLC,** a Delaware limited liability company

By:_____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**KORNBLUTH TEXAS, LLC,** a Texas limited liability company

By: _____
    Name: Cheryl Tyler
    Title:  Manager

LENDER:

**RIALTO MORTGAGE FINANCE, LLC,** a Delaware limited liability company

By: _____
    Name:
    Title:    Liat Heller
          Authorized Signatory

## SCHEDULE I

## (SINGLE PURPOSE ENTITY)

A "**Single Purpose Entity**" means a corporation, limited liability company or limited partnership that:

(a)     is organized solely for the purpose of (i) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, obtaining the Loan from Lender and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing; (ii) acting as a managing member of the limited liability company that owns the Property; or (iii) acting as a general partner of the limited partnership that owns the Property;

(b)     has not engaged and will not engage in any business or activity unrelated to (i) the acquisition, development, ownership, management or operation of the Property, (ii) acting as a managing member of the limited liability company that owns the Property; or (iii) acting as a general partner of the limited partnership that owns the Property;

(c)     has not owned and will not own any assets other than (i) the Property, (ii) such incidental Personal Property as may be necessary for the operation of the Property, (iii) the membership interest in the limited liability company that owns the Property; or (iv) the general partnership interest in the limited partnership that owns the Property;

(d)     has not engaged in, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, or transfer of its partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company);

(e)     has preserved and will preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation and will not without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its Organizational Documents, or consent to or suffer the amendment, modification, termination or breach of any of the Organizational Documents, or amend, modify, terminate or fail to comply with, or consent or suffer the amendment, modification, termination or breach of any Organizational Documents of any entity in which it owns an interest;

(f)     has not owned and will not own any subsidiary or make any investment in, any person or entity;

(g)     has not commingled and will not commingle its assets with the assets of any of its general partners, managing members, shareholders, Affiliates, principals or of any other person or entity;

(h)     has not incurred and will not incur any Indebtedness, other than, with respect to

Borrower and, if Borrower is a limited partnership, its Single Purpose Entity general partner, the following: (i) the Debt and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding one percent (1%) of the original principal amount of the Loan at any one time; provided that any Indebtedness incurred pursuant to clause (ii) shall be (A) outstanding not more than sixty (60) days and (B) incurred in the ordinary course of business.  No Indebtedness, other than the Debt, may be secured (senior, subordinate or pari passu) by the Property;

     (i)     has maintained and will maintain its financial statements, accounting records, bank accounts and other entity documents separate and apart from those of the partners, members, shareholders, principals and Affiliates of such entity, and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except that such entity's financial position, assets, results of operations and cash flows may be included in the consolidated financial statements of an Affiliate of such entity in accordance with GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

     (j)     has not entered into or been a party to and will not enter into or be a party to any contract or agreement with any general partner, managing member, shareholder, principal or Affiliate of Borrower, any Guarantor, or any general partner, managing member, shareholder, principal or Affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties;

     (k)     has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

     (l)     has not made and will not make any loans to any third party;

     (m)     has held itself out and identified itself and will hold itself out and identify itself to the public as a legal entity separate and distinct from any other Person;

     (n)     has conducted and will conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that such entity is responsible for the debts of any third party (including any general partner, managing member, shareholder, principal or Affiliate of such entity, but not including any Single Purpose Entity limited partnership of which such entity is expressly permitted to be a general partner in accordance with the terms hereof);

     (o)     is and will endeavor to remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;  .

     (p)     has maintained and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(q)     has filed and will file its own tax returns, if any, as may be required under applicable law, to the extent such entity is (1) not part of a consolidated group filing a consolidated return or returns or (2) not treated as a division solely for tax purposes of another taxpayer, and has paid and will pay any taxes so required to be paid under applicable law;

(r)     has allocated and will allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(s)     has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations and pay the salaries of its own employees from its own funds;

(t)     has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(u)     has held and will hold its assets in its own name and has conducted and will conduct its business in its own name;

(v)     has paid and will pay its own liabilities and expenses;

(w)     has observed and will observe all corporate, limited liability company or limited partnership formalities, as applicable;

(x)     has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except by virtue of its status as a Single Purpose Entity general partner of a Single Purpose Entity limited partnership that has been approved by Lender;

(y)     has not and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(z)     maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name;

(aa)     has not pledged and will not pledge its assets for the benefit of any other Person;

(bb)     has not and will not have any obligation to, and will not, indemnify its partners, officers, directors or members, as the case may be, unless such an obligation is fully subordinated to the Debt and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(cc)     does not and will not have any of its obligations guaranteed by any Affiliate of such entity;

(dd)     has complied and will comply with all of the terms and provisions contained in its Organizational Documents;

(ee)    has acted and will continue to act in a manner to make the statement of facts contained in its Organizational Documents true and correct;

(ff)    has considered and will continue to consider the interests of its creditors in connection with all actions;

(gg)    intentionally omitted;

(hh)    if such entity is a limited partnership, does not and will not have any general partner that is not a Single Purpose Entity that owns at least one-half of one percent (0.5%) of the partnership interests in such limited partnership;

(ii)    if such entity is a limited liability company, has and will continue to have at least one (1) managing member that is a Single Purpose Entity that owns at least one-half of one percent (0.5%) of the membership interests of the limited liability company ("**SPC Party**") or, if such entity does not have a SPC Party, is as of the date hereof, and will continue to be, a Delaware limited liability company that has Organizational Documents that provide that, as long as any portion of the Debt remains outstanding, upon the occurrence of any event that causes the last remaining member of such entity or the sole member of such entity if such entity is a single member limited liability company (such last remaining member or single member shall be referred to herein as "**Sole Member**") to cease to be a member of such entity (other than (i) upon an assignment by Sole Member of all of its limited liability company interests in such entity and the admission of the transferee, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents, or (ii) the resignation of Sole Member and the admission of an additional member of such entity, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents), a Person that has signed the operating agreement of such limited liability company, without any action of any Person and simultaneously with Sole Member ceasing to be a member of such entity, automatically be admitted as a member of such entity (a "Special Member") and shall preserve and continue the existence of such entity without dissolution. The Organizational Documents of such entity shall further provide that for so long as any portion of the Debt is outstanding, no Special Member may resign or transfer its rights as a Special Member unless (A) a successor Special Member has been admitted to such entity as a Special Member, and;

(jj)    if such entity is a limited liability company that does not have a SPC Party, is as of the date hereof, and will continue to be, a Delaware limited liability company that has Organizational Documents that provide that, as long as any portion of the Debt remains outstanding: (i) such entity shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining member of such entity or the occurrence of any other event which terminates the continued membership of the last remaining member of such entity in such entity unless the business of such entity is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "Act"), or (B) the entry of a decree of judicial dissolution under Section 18-802 of the Act; (ii) except as expressly permitted pursuant to the terms of the Loan Documents, (y) Sole Member may not resign (in the case of a single member limited liability company), and (z) no additional member shall be admitted to such entity; and (iii) upon the occurrence of any event that causes the last remaining member of such entity to cease to be a

member of such entity or that causes Sole Member to cease to be a member of such entity (other than (A) upon an assignment by Sole Member of all of its limited liability company interests in such entity and the admission of the transferee, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents, or (B) the resignation of Sole Member and the admission of an additional member of such entity, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing (1) to continue the existence of such entity, and (2) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such entity, effective as of the occurrence of the event that terminated the continued membership of such member in such entity; (iv) the bankruptcy of Sole Member or a Special Member shall not cause such Sole Member or Special Member to cease to be a member of such entity and upon the occurrence of such event, the business of such entity shall continue without dissolution; (v) in the event of the dissolution of such entity, such entity shall conduct only such activities as are necessary to wind up its affairs (including the sale of its assets and properties in an orderly manner), and its assets and properties shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and (vi) to the fullest extent permitted by applicable law, each member and Special Members shall irrevocably waive any right or power that they might have to cause such entity or any of its assets or properties to be partitioned, to cause the appointment of a receiver for all or any portion of the assets or properties of such entity, to compel any sale of all or any portion of the assets or properties of such entity pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of such entity;

      (kk)    intentionally omitted;

      (ll)    intentionally omitted;

      (mm)  the Organizational Documents of such entity shall from and after the date hereof provide that such entity will not (and such entity agrees that it will not), without (i) the unanimous consent of its board of directors or managers, or (ii) if such entity is a limited liability company with a SPC Party or a limited partnership, the unanimous consent of the board of directors or managers, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (B) seek or consent to the appointment of a receiver, liquidator or any similar official for such entity or a substantial portion of its assets or properties, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors, (E) admit in writing such entity's inability to pay its debts generally as they become due, (F) declare or effectuate a moratorium on the payment of any obligations, or (G) take any action in furtherance of any of the foregoing;

      (nn)    the Organizational Documents of such entity shall provide an express acknowledgment that Lender is an intended third-party beneficiary of the "special purpose" and "separateness" provisions of such Organizational Documents; and

      (oo)    is as of the date hereof in compliance with and will continue to comply with all of

the assumptions made in any Insolvency Opinion delivered in connection with the Loan.

.

## SCHEDULE II

## (ORGANIZATIONAL CHART)

.

## ORGANIZATIONAL CHART
### (Borrowing Entity)



William K. Kornbluth
26 shares

Delores T. Kornbluth
25 shares

Cheryl Tyler
49 shares

25.52%

25.52%

49.96%

Kornbluth Enterprises, Inc.
a California corporation
EIN: 95-321929

100%

Kornbluth Texas, LLC, a Texas limited liability
company
EIN: 81-4152874

Kornbluth Enterprises, Inc.

Board of Directors:
William K. Kornbluth
Cheryl Tyler

Officers:
William K. Kornbluth – President
Cheryl Tyler – Vice President
Delores T. Kornbluth – Secretary

Kornbluth Texas, LLC

Manager:  Cheryl Tyler
Sole Member: Kornbluth Enterprises, Inc.

GSB:8048638.1 [39643.00300]

3125084 v1 Org Chart - HIE Webster

## SCHEDULE III

### (RENT ROLL)

NONE

## SCHEDULE IV

### (REQUIRED REPAIRS – DEADLINES FOR COMPLETION)

NONE.

## **SCHEDULE V**

Intentionally Omitted                                    .

.

# SCHEDULE VI

## (CREDIT CARD COMPANIES)

1.

2.

3.

4.

5.

## EXHIBIT A

### Form of Tenant Instruction Notice

TENANT DIRECTION LETTER

_____, 201_

[Addressee]

Re:   Payment Direction Letter for _____,
      _____, _____ (the "**Property**")

Dear [_____]:

_____, a _____ ("**Borrower**"), the owner of the Property, has granted a security interest in the Property to Rialto Mortgage Finance, LLC, a Delaware limited liability company  (together with its successors and assigns, "Lender") and has agreed that all rents due for the Property will be paid directly to a bank selected by Borrower and approved by Lender.  Therefore, from and after the date hereof, all rent to be paid by you under the Lease between Borrower and you (the "**Lease**") should be sent directly to the following address:

> [CLEARING ACCOUNT BANK'S ADDRESS]
> or by wire transfer to:
> Bank:
> ABA No.:
> Account No.:
> Account Name:   _____ Clearing Account,
> [_____, as Secured Party]

All checks should be made out to "_____".

These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or its agent ("Servicer"), or pursuant to a joint written instruction from Borrower and Lender or Servicer.  Until you receive written instructions from Lender or Servicer, continue to send all rent payments due under the Lease to _____.  All rent payments must be delivered to _____ no later than the day on which such amounts are due under the Lease.

If you have any questions concerning this letter, please contact _____ of Borrower at _____ or [_____] of Lender at _____ or _____ of Servicer at _____. We appreciate your cooperation in this matter.

                                       _____,

a _____

By:_____
    Name:
    Title:

## EXHIBIT B

## Form Of Credit Card Instruction Notice

_____, 20___

To:     [Name and Address of Credit Card Processor]
        ("Processor")

Re:     _____ ("Borrower")
        Merchant Account Number: _____

Dear Sir/Madam:

Under various agreements among Borrower and Rialto Mortgage Finance, LLC, a Delaware limited liability company, having an address at 600 Madison Avenue, 12th Floor, New York, New York 10022 ("**Lender**"), Borrower has granted to the Lender a security interest in and to Borrower's inventory, accounts, general intangibles, equipment, and other assets, including, without limitation, all amounts due or to become due from the Processor to Borrower.

Under the terms and provisions of such agreements, Borrower is obligated to deliver all of the Borrower's accounts, accounts receivable, and proceeds of inventory to a deposit account designated by the Lender (the "**Clearing Account**"). Such accounts include all credit card charges (the "**Charges**") submitted by Borrower to the Processor for processing and the amounts which the Processor owes to Borrower on account thereof (the "**Credit Card Proceeds**").

This letter clarifies the respective interests and rights of Lender and Processor in and to the Charges and the Credit Card Proceeds and provides, subject to the conditions hereof, for the transmittal by Processor to the Clearing Account of the Credit Card Proceeds, as well as any other proceeds of Lender's collateral received by Processor.

1.      Processor recognizes that all Charges and Credit Card Proceeds constitute collateral granted by Borrower to Lender.

2.      Processor recognizes that Borrower has granted the Lender a security interest in, and collaterally assigned to Lender, the contents of any reserve accounts or the like maintained by Borrower with Processor in respect of Borrower's credit card arrangements with Processor and as well as in and to any right to payment now or hereafter arising from Processor to Borrower.

3.     Until Processor receives written notification from Lender that the interest of Lender in the Charges and the Credit Card Proceeds has been terminated, all amounts as may become due from time to time from Processor to Borrower shall be transferred only to the Clearing Account as follows:

> Bank:
> ABA No.:
> Account No.:
> Account Name:_____ Clearing Account,
> [_____, as Secured Party]

Any such transfers shall be initiated no later than 10:00AM on each business day on which any amount is owed by Processor to Borrower and shall be for the full amount then so owed, without set off or reduction.

4.     A copy of each periodic statement issued by Processor to Borrower shall be provided to the Lender at the following address (which address may be changed upon seven (7) days written notice given to Processor by Lender):

> _____
> _____
> _____
> Attn:  _____

5.     Processor shall not provide any loans, advances, or financial accommodations to Borrower and shall not amend Processor's agreements with the Borrower without the prior written consent of Lender.

6.     The Processor will:

> (a)     Provide Lender with written notice upon the establishment of any escrow, reserve, or other account which the Processor has, or proposes to establish, with respect to its credit card relationship with Borrower.

> (b)     Release any funds which it may hold in any such escrow, reserve, or other account no later than thirty (30) days after the sooner of the termination of that account or the termination of the credit card relationship between Processor and Borrower.

7.     Processor shall be fully protected in acting on any order or direction by Lender respecting the Charges and the Credit Card Proceeds without making any inquiry whatsoever as to Lender's right or authority to give such order or direction or as to the application of any payment made pursuant thereto.

8.      These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or its agent ("Servicer"), or pursuant to a joint written instruction from Borrower and Lender or Servicer.  If you have any questions concerning this letter, please contact _____ of Borrower at _____ or [_____] of Lender at _____ or _____ of Servicer at _____.  We appreciate your cooperation in this matter.

_____,

a _____

By:_____

     Name:
     Title: